LeCrone, Appellant, *v.* The Ohio Bell Telephone Co., Appellee.*

(No. 7098—Decided September 10, 1963.)

*Mr. William J. Lohr,* for appellant.

*Messrs. Porter, Stanley, Treffinger & Platt* and *Mr. John H. Leddy,* for appellee.

Duffey, J. This is an appeal from a judgment of the Common Pleas Court of Franklin County. The action is one in in-

---

*Appellant's name in a former report of this case in 114 Ohio App., 299, appears as LaCrone.

130

tentional tort for invasion of privacy. The judgment was rendered upon defendant-appellee's motion for a directed verdict at the close of plaintiff-appellant's case. The evidence must therefore be construed most favorably to the plaintiff and where sufficient to raise an issue of fact must be resolved in plaintiff's favor.

Plaintiff, Mary LeCrone (nee Dodge), was the wife of Clayton LeCrone. They resided at 230 Rosslyn Avenue, Columbus, Ohio, for about twelve years. In early 1960, a divorce action was pending, and a court hearing had been held in February. Mrs. LeCrone commenced the proceedings, and the divorce was eventually awarded her husband in late 1960. However, in March 1960, Mrs. LeCrone had moved from the Rosslyn address to an apartment at 1494 North High Street, Columbus, Ohio, which was about seven or eight miles from Rosslyn Avenue. While the divorce had not been granted at that time, there had been a legal separation.

After moving, she requested telephone service from the defendant, The Ohio Bell Telephone Company. She subscribed for a private line in her own name. At that time, the company's representative questioned her about her relationship to her husband. She informed the representative that she was responsible for her own debts and had to pay her own phone bill, that she was employed, and that she was getting a divorce. The billings for the line were sent to her in her name and she paid them. Her husband did not pay them.

On May 11, 1960, a company service representative received a request for an extension on Mrs. LeCrone's line, the extension to be placed at her husband's home at 230 Rosslyn Avenue. The person making the request is not identified in the record. The service representative merely testified that it was a male and that she did not know who it was of her own knowledge. The telephone installation man testified that he installed the extension at Rosslyn, and that he talked to a man there who identified himself as Mr. LeCrone. This extension service was provided by simply placing a "jumper" on the company's equipment at its central office from Mrs. LeCrone's line to another and then installing a phone at the Rosslyn address. No one went to Mrs. LeCrone's apartment or dealt with the wires at her apartment. No one notified Mrs. LeCrone of the exten-

sion order or installation. The billing for the extension was made separately to Clayton LeCrone. Mrs. LeCrone testified that thereafter she heard "noise on my phone, like someone was listening in." She complained to the company about the noise. The line was checked and no malfunction of the equipment was found. She complained again about noises. On May 30, another check was made and she was informed for the first time of the existence of the extension. She informed the company that she did not ask for such an extension and requested that it be cut off immediately. It was disconnected the next day.

Mrs. LeCrone could not say "of her own knowledge" that anyone listened to her conversations, and she expressly disclaimed that anyone connected with or employed by the company listened to her conversations. The conversations during this period included talks with friends and with her attorney as to the pending divorce and property settlement. There is also testimony as to distress, anguish, nervousness and other effects of the occurrence.

Dean William L. Prosser has pointed out that in the development of the right of privacy the courts today generally recognize four distinct types of invasion which, while overlapping, are yet quite distinct. One of these is the intrusion upon a person's seclusion or private affairs. See Prosser, Privacy, 48 Cal. L. Rev., 383 (1960). The Ohio Supreme Court has described this invasion as "the wrongful intrusion into one's private activities in such manner as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Housh* v. *Peth* (1956), 165 Ohio St., 35. It is interesting to note that Dean Prosser points out that this aspect of the right of privacy was not involved in the original essays of Warren and Brandeis in the year 1890 in 4 Harvard Law Review, 193.

As the *Housh case* states, the act must be one which is offensive or objectionable to the reasonable man. It is also necessary that the thing intruded upon or pried into is, and must be entitled to be, private. The interest protected is primarily a mental one rather than economic or pecuniary. It is an intentional tort analogous to trespass and battery in protection of personal integrity. Actual damage is not necessary. Proof of the unjustified invasion entitles the plaintiff to at least

nominal damages, and the jury may award substantial damages. Special pecuniary loss as well as punitive damages may be recovered if pleaded and proved.

As a general proposition, eavesdropping on phone conversations of another by unauthorized mechanical means, or a so-called "tap," is the kind of act or conduct that fits the definition of an intrusion or prying into another's private affairs. Such conduct generally would be criminal, a violation of public utility law, a clear invasion of the subscriber's right to exclusive use and, in our opinion, an affront to the sensibilities of a reasonable man. The decision of this court in an earlier appeal of this case and the decisions of other states so hold. *LaCrone* v. *Ohio Bell Telephone Co.* (1961), 114 Ohio App., 299; *McDaniel* v. *Atlanta Coca-Cola Bottling Co.* (1939), 60 Ga. App., 92, 2 S. E. (2d), 810; *Rhodes* v. *Graham* (1931), 238 Ky., 225, 37 S. W. (2d), 46; *Souder* v. *Pendleton Detectives, Inc.* (La., 1956), 88 So. (2d), 716; *Roach* v. *Harper* (1958), 143 W. Va., 869, 105 S. E. (2d), 564. Cf. *People* v. *Trieber* (1946), 28 Col. (2d), 657, 171 P. (2d), 1. As to possible permissible "monitoring," see *Chaplin* v. *National Broadcasting Co., Inc.* (S. D., N. Y. 1953), 15 F. R. D., 134, at 140; *People* v. *Appelbaum* (1950), 277 App. Div., 43, 97 N. Y. S. (2d), 807, affirmed, 301 N. Y., 738, 95 N. E. (2d), 410; *Schmukler* v. *Ohio Bell Telephone Co.* (C. P., 1953), 66 Ohio Law Abs., 213.

The questions presented by the facts in this case are: (1) There being no act of physical trespass by anyone, and no eavesdropping by any employee or agent of appellee company, has the company itself committed an act of invasion of privacy? Plaintiff contends that the mere fact of installation, regardless of the interception of conversations, is an invasion. (2) Is the defendant a joint tortfeasor with several liability as an aider in an actionable invasion of privacy by the husband, Clayton LeCrone? As discussed infra, this requires proof of an actionable invasion by the third person and substantial material assistance by defendant with knowledge. The subsidiary questions under this analysis are:

(a) Did the husband commit an actionable invasion of plaintiff's privacy? There is an evidentiary question of the sufficiency of proof that the husband did eavesdrop. Assuming that, there is the legal question of the effect of the relationship

of husband and wife upon the concept of what constitutes an invasion of privacy.

(b) While it is apparent that the installation of the extension was substantial aid in the husband's acts, is there sufficient evidence to hold the corporation to knowledge of an unlawful use? \

Returning to the first question, plaintiff has earnestly contended that the fact of an unauthorized connection on her line is an invasion regardless of whether anyone listens to a conversation. Reliance is placed on Judge McLaughlin's opinion in the earlier appeal, 114 Ohio App., 299. The point was not before the court in ruling on the demurrer. The amended petition specifically alleged that the defendant did tap and "did intercept" telephone conversations. Isolated statements in the opinion might be construed to support plaintiff's contention. However, in context, the decision clearly assumed that conversations were overheard. The distinction made by Judge McLaughlin was that there need not be any allegation as to the content of the conversations or a publication of any information so obtained. These matters aggravated the offense and go to damages. They are not essential to the cause of action. It was in contradistinction to *publication* that the opinion of this court referred to the "tap or wrongful or unwarranted connection" as constituting an original act of intrusion. It might also be noted that the court did not have before it any information as to the manner in which the connection of the extension was accomplished.

We think it significant that in each of the cases cited the facts show that conversations were intercepted. In considering them it is also well to note that, as Dean Prosser has pointed out in his article, several distinct acts of invasion are frequently combined in a particular occurrence. For example, in many instances, the conduct in installing equipment, or otherwise preparing to eavesdrop, will itself constitute a trespass and a physical invasion of another's seclusion regardless of eavesdropping. In the present case, no physical intrusion was made upon plaintiff's premises. All acts which enabled or created the capacity to eavesdrop occurred off the premises and with reference to defendant's equipment and Clayton LeCrone's house. This case is unique in that respect. The fact of a tap may, as

indicated infra, be evidence from which to infer the fact of interception and eavesdropping, but in this case it is conceded that defendant did not in fact intercept any conversations.

The mere making of the connection might constitute a breach of contract by defendant. The threat to so do might possibly form the basis for injunctive relief. However, in our opinion, the only possible act which could constitute an invasion in the present case is the eavesdropping itself, and the connection or tap here constitutes only a preparation for that invasion of privacy.

Accordingly, we conclude that any liability of the defendant on these facts must rest on the second ground alleged in the amended petition, *i. e.*, that defendant "intentionally * * * by such means, did allow persons unauthorized by the plaintiff to listen to and intercept plaintiff's private telephone conversations."

One who materially aids or abets a wrongful act by another may be as responsible as the one who commits the act, so as to impose liability upon the former to the same extent as if he had performed the act himself. See discussion in *Kuhn* v. *Bader* (1951), 89 Ohio App., 203. See, also, 52 American Jurisprudence, 454, Section 114. For harm done to a third person from the tortious conduct of another, a person is liable if he permits the other to act with his instrumentalities knowing or having reason to know that the other is acting or will act tortiously. 4 Restatement of the Law of Torts, 442, Section 877. See, also, 52 Ohio Jurisprudence (2d), 242, Sections 18 and 19.

As previously stated, under the facts here, the only act which can constitute an invasion is that of interception of or eavesdropping upon conversations. Has plaintiff presented sufficient evidence to raise an issue of fact as to the husband's interception of calls? Listening is a product of nerve and mind. It cannot be directly proved but must be established by inference from other facts. Obviously, the best circumstantial proof would be the repeating of information which could not otherwise be obtained. Likewise, it would be helpful if there was an eyewitness to the person holding the phone to his ear. However, in the nature of an invasion by eavesdropping through mechanical means, we cannot expect such evidence to be readily

produced. There is no dispute that the connection was on Mrs. LeCrone's line for several weeks and that it rang on every incoming call. It seems arguable in terms of a prima facie case that (1) the existence of the means (2) for a substantial period of time and (3) the physical access to the instrument of a person with a motive such as the husband's here are a sufficient basis to raise a reasonable inference of the fact of interception. In the present case, the evidence also shows that this is the person who procured the installation. Further, there were interference "noises" on the phone, although inspection of the equipment by the defendant failed to turn up any mechanical malfunction. Understandably, plaintiff could not, of her own knowledge, state that someone had listened to her conversations. However, she did characterize the noise as "like someone was listening in." Considering the widespread public experience with telephones, we are not willing to consider that testimony as a mere opinion. It is difficult to describe the effect of an open extension, but we think it common knowledge that an effect is produced. In our opinion, the evidence of record is sufficient to raise an issue for the jury and to justify a finding that conversations were in fact intercepted.

The most difficult problem in this case is the question of whether plaintiff had a right to privacy as against her husband. The existence of a marital relationship obviously has great significance with respect to the concept of the integrity of the person. On the other hand, we no longer live in the 17th century era of the husband's prerogatives. The ancient common-law concepts were radically changed in Ohio by various Married Women's Acts. Some of these were passed early in the 19th century and the concepts have been undergoing a constant process of development through statutory enactment and judicial interpretation. An extensive discussion of the subject of husband's and wife's rights is found in the opinion of Judge Matthias in *Damm* v. *Elyria Lodge No. 465, Benevolent Protective Order of Elks* (1952), 158 Ohio St., 107. It is observed there that the law has "assigned to a married woman a separate legal *identity* and secured for her a separate legal estate in her own property." (Emphasis added.) In that case, a unanimous court upheld the principle of a husband's personal liability to his wife in tort—liability for intentional tort and for negligence.

In *Lowman* v. *Lowman* (1956), 166 Ohio St., 1, at pages 9 and 10, the court again reaffirmed the husband's liability to his wife for "willful or negligent acts."

It may be conceded that as to privacy a husband and wife are not on the same footing as strangers. See 28 Ohio Jurisprudence (2d), 124, Husband and Wife, Section 4. However, there is no occasion here to consider more than the use of a private telephone installed in a separate building in the wife's name and on her credit alone. We think it clear that under Sections 3103.05 and 3103.07, Revised Code, the wife could contract with defendant for the use of the telephone line and could obtain contract right to exclude the use of it by her husband without her permission. Various utility statutes are cited by defendant in his answer and briefs concerning the use of a subscriber's instrument by the family and household. These statutes merely deal with utility classifications of users for the determination of rates and similar purposes. They do not circumscribe the subscriber's and company's right to contract for more exclusive use. We see no essential difference between a wife's right to make such a contract and a wife's contract with a bank for a safety deposit box. Similarly, under the statutes she may purchase and have exclusive use of an auto, or contract for services such as an individual checking or savings account.

Even so, we make no conclusion in this case as to the wife's rights as against her husband with respect to exclusive use of such facilities where the parties are living together in cohabitation. In the present case, the plaintiff and her husband were living apart. On six occasions Mrs. LeCrone testified that they were living apart and had a legal separation. We recognize that Section 3103.04, Revised Code, prevents a spouse excluding the other from the dwelling except upon court order. Section 3103.06, Revised Code, also limits the power of a husband and wife to make a contract altering their legal relations. Under the statute, a husband and wife cannot change the essential obligations and rights of the marriage relation *while they live together.* However, the marriage relationship may be changed by a reasonable agreement entered into after the parties have separated, or when they contemplate an immediate separation. See 28 Ohio Jurisprudence (2d), 122, Husband and Wife, Section 2. Under an express exception of Section 3103.06, Revised

Code, and its judicial interpretation, *"on separation*, a husband and wife may enter into an agreement mutually releasing their respective rights to dower and distributive shares *and releasing each other from claims for care*, support or maintenance." (Emphasis added.) *Meyer* v. *Meyer* (1950), 153 Ohio St., 408. See, also, *Lowman* v. *Lowman* (1956), 166 Ohio St., 1, at pages 7 and 8, and *Hoagland* v. *Hoagland* (1925), 113 Ohio St., 228. Thus, we think it clear that where there is a separation agreement, accompanied by actual separation, the parties may enter into an enforceable contract to live apart. Where the wife has acquired the legal right to live apart from her husband, she clearly has a right to solitude and privacy in her affairs, and to talk to her attorney and to her friends without interference as against her husband. The record does not describe the terms of the separation. However, defendant made no effort to explore this. In the absence of any further evidence and in reviewing a directed verdict, we think that on the present record the plaintiff's testimony was sufficient to prima facie establish that she and her husband were living apart by mutual consent. It might be well to comment here that the relationship of husband and wife frequently presents problems of one acting as the agent for the other. In the present case, it is clear that the husband had no actual authority and, as indicated infra, no apparent authority to act for his wife in ordering the extension.

We, therefore, conclude that the plaintiff presented a prima facie case of an actionable invasion of privacy by her husband. The remaining question is the liability of defendant for knowingly aiding in that tort.

The record shows that when Mrs. LeCrone requested service from defendant, the corporation's service representative questioned her with respect to her husband and their relationship to each other. In response to those questions, the company was told that she was responsible for her own debts, that she had to pay her own phone bill, that she was employed and where, and that she was getting a divorce. It is pertinent to note too that Mrs. Raymond, the service representative who took the "order" for the extension, testified that her duties were to take any orders for service. The information provided the corporation is, in our opinion, more than enough to put any

reasonable person at least on inquiry as to the husband's authority to obtain an extension on the line. Of course, a corporation is not chargeable with the knowledge of its employee obtained with respect to a totally unrelated corporate function, *i. e.*, an application by Mrs. LeCrone for employment. Here the record establishes a communication of facts to an employee of the corporation (1) within that employee's scope of authority, (2) with relation to the matter of service on the telephone line, and (3) to the very same department which handled the installation. Under principles of corporation law, the corporation is chargeable with that knowledge. While there is no evidence that the subsequent employee, Mrs. Raymond, knew of those facts, that is immaterial to the corporation's liability. It may be pertinent to good faith and lack of malicious intent, but these are relevant only as to damages. The instrumentality provided by the company here could be and was, in fact, usable only on Mrs. LeCrone's line. Of this the company obviously had knowledge. The case is thus quite distinguishable from an ordinary supplier of a product or service, *i. e.*, one who sells a tape recorder later used for a tort. The company also had knowledge that the husband had no authority to order such an extension. It provided the instrument anyway, knowing of its only possible use. Accordingly, it knowingly rendered material aid to another person's commission of a tort. It is therefore severally liable.

This is a most difficult case, and it is not with unmixed feelings that we have reached this result. The decision reflects the specific factors present here—factors which the company's policy simply ignored at the time the events occurred. They are factors which would not ordinarily be found in the average instance of one spouse ordering service for a line held in another's name. We, therefore, do not foresee the horrendous results suggested. Dire predictions of excessive litigation and substantial liability always accompany any important decision affecting business practices. In the present case, it might be noted that there is no allegation or proof of special pecuniary loss, nor do we believe that at present there is sufficient evidence to justify punitive damages. It is not an aggravated case involving publication or other use of information obtained. Yet, in our opinion, the case represents an important principle with

respect to personal integrity which deserves the protection of the law. How much damages the plaintiff ought to recover must await a jury's determination as subject to judicial control.

The judgment of the Common Pleas Court is reversed and the cause is remanded for further proceedings.

*Judgment reversed.*

McLAUGHLIN, J., concurs.
RUTHERFORD, J., dissents.

McLAUGHLIN and RUTHERFORD, JJ., of the Fifth Appellate District, sitting by designation in the Tenth Appellate District.