**Drew PEARSON and Jack Anderson, Appellants,**

**v.**

**Thomas J. DODD, Appellee.**

**No. 21910.**

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 12, 1968.

Decided Feb. 24, 1969.

Certiorari Denied June 9, 1969.
See 89 S.Ct. 2021.

Mr. John Donovan, Washington, D. C., with whom Mr. Warren Woods and Mrs. Betty Southard Murphy, Washington, D. C., were on the brief, for appellants.

Mr. John F. Sonnett, New York City, with whom Mr. Donald J. Mulvihill, Washington, D. C., was on the brief, for appellee.

Before WRIGHT, TAMM and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case arises out of the exposure of the alleged misdeeds of Senator Thomas Dodd of Connecticut by newspaper columnists Drew Pearson and Jack Anderson. The District Court has granted partial summary judgment to Senator Dodd, appellee here, finding liability on a theory of conversion. At the same time, the court denied partial summary judgment on the theory of invasion of privacy. Both branches of the court's judgment are before us on interlocutory appeal.[1] We affirm the District Court's denial of summary judgment for invasion of privacy and reverse its grant of summary judgment for conversion.

The undisputed facts in the case were stated by the District Court as follows:

" * * * [O]n several occasions in June and July, 1965, two former employees of the plaintiff, at times with the assistance of two members of the plaintiff's staff, entered the plaintiff's office without authority and unbeknownst to him, removed numerous documents from his files, made copies of them, replaced the originals, and turned over the copies to the defendant Anderson, who was aware of the manner in which the copies had been obtained. The defendants Pearson and Anderson thereafter published articles containing information gleaned from these documents."[2]

I

The District Court ruled that appellants' six newspaper columns concerning appellee, which were attached to appellee's complaint, did not establish liability for the tort of invasion of privacy. That tort, whose historical origin lies in the famous Warren and Brandeis article of 1890,[3] is recognized in the District of Columbia.[4] It has always been considered a defense to a claim of invasion of privacy by publication, however, that the published matter complained of is of general public interest.[5] The columns complained of here gave appellants' version of appellee's relationship with certain lobbyists for foreign interests, and gave an interpretive biographical sketch of appellee's public career. They thus clearly bore on appellee's qualifications as a United States Senator,[6] and as such amounted to a paradigm example of published speech not subject to suit for invasion of privacy.

---

1. The operative part of the District Court's order stated "that the defendants are liable to the plaintiff on the theory of conversion of documents belonging to the plaintiff, but not on a theory of invasion of privacy." The court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b) (1964). Appellee and appellants both moved that this court grant interlocutory appeals. We denied appellee's motion, while granting that of appellants. Our order granting appellants' motion specified that the privacy as well as the conversion question shoud be briefed.

2. Dodd v. Pearson, D.D.C., 279 F.Supp. 101, 102 (1968).

3. Warren and Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890).

4. Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649 (1966) (en banc); Bernstein v. National Broadcasting Co., D.D.C., 129 F.Supp. 817 (1955), affirmed, 98 U.S.App.D.C. 112, 232 F.2d 369, cert. denied, 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed.2d 239 (1956).

5. Afro-American Publishing Co. v. Jaffe, supra Note 4; Sidis v. F–R Publishing Corp., 2 Cir., 113 F.2d 806, 138 A.L.R. 15, cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940); cf. Warren and Brandeis, supra Note 3, 4 Harv.L.Rev. at 214–216.

6. Since under common law principles appellants' publication does not amount to an invasion of privacy, we need not reach the serious constitutional questions suggested by Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

Indeed, appellee has not urged with any vigor on appeal the theory that appellants' publications in themselves tortiously invaded his privacy. Rather he has argued that the District Court misapprehended his privacy claim, which went rather to the manner in which the information in the columns was obtained than to the matter contained in them.

Appellee proceeds under a branch of privacy theory which Dean Prosser has labeled "intrusion," [7] and which has been increasingly recognized by courts [8] and commentators [9] in recent years. Thus it has been held that unauthorized bugging of a dwelling,[10] tapping a telephone,[11] snooping through windows,[12] and over-zealous shadowing [13] amount to invasions of privacy, whether or not accompanied by trespasses to property.

■ Unlike other types of invasion of privacy, intrusion does not involve as one of its essential elements the publication of the information obtained.[14] The tort is completed with the obtaining of the information by improperly intrusive means.

"Intrusion" has not been either recognized or rejected as a tort in the District of Columbia. It has been recognized by a number of state courts, most recently by the New Hampshire Supreme Court in Hamberger v. Eastman.[15] *Hamberger* found liable a defendant who eavesdropped upon the marital bedroom of plaintiffs by electronic means, holding that "the invasion of the plaintiffs' solitude or seclusion * * * was a violation of their right of privacy." [16]

■ We approve the extension of the tort of invasion of privacy to instances of intrusion, whether by physical trespass or not, into spheres from which an ordinary man in a plaintiff's position could reasonably expect that the particular defendant should be excluded. Just as the Fourth Amendment has expanded to protect citizens from government intrusions where intrusion is not reasonably expected,[17] so should tort law protect citizens from other citizens. The protection should not turn exclusively on the question of whether the intrusion involves a technical trespass under the law of property. The common law, like the Fourth Amendment, should "protect people, not places." [18]

The question then becomes whether appellants Pearson and Anderson improperly intruded into the protected sphere of privacy of appellee Dodd in obtaining the information on which their columns were based. In determining this question, we may assume, without deciding, that appellee's employees and former employees did commit such an improper intrusion when they removed confidential files with the intent

7. Prosser, Privacy, 48 Calif.L.Rev. 383, 389–392 (1960).

8. *See* Notes 10–13 *infra*.

9. Prosser, *supra* Note 7; *cf.* Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N.Y.U. L.Rev. 962, 972–977 (1964).

10. Hamberger v. Eastman, 106 N.H. 107, 206 A.2d 239, 11 A.L.R.3d 1288 (1964); Roach v. Harper, 143 W.Va. 869, 105 S. E.2d 564 (1958).

11. Fowler v. Southern Bell Telephone & Telegraph Co., 5 Cir., 343 F.2d 150 (1965); LeCrone v. Ohio Bell Telephone Co., 120 Ohio App. 129, 201 N.E.2d 533 (1963).

12. Souder v. Pendleton Detectives, Inc., La.App., 88 So.2d 716 (1965).

13. Pinkerton National Detective Agency, Inc. v. Stevens, 108 Ga.App. 159, 132 S.E.2d 119 (1963).

14. Fowler v. Southern Bell Telephone & Telegraph Co., *supra* Note 11, 343 F.2d at 156; Hamberger v. Eastman, *supra* Note 10, 206 A.2d at 242.

15. *Supra* Note 10.

16. 206 A.2d at 242.

17. *Compare* Olmstead v. United States, 277 U.S. 438, 457, 464, 466, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and Goldman v. United States, 316 U.S. 129, 134–136, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), *with* Katz v. United States, 389 U.S. 347, 352–353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

18. Katz v. United States, *supra* Note 17, 389 U.S. at 351, 88 S.Ct. 507.

to show them to unauthorized outsiders.[19]

Although appellee's complaint charges that appellants aided and abetted in the removal of the documents, the undisputed facts, narrowed by the District Judge with the concurrence of counsel, established only that appellants received copies of the documents knowing that they had been removed without authorization.[20] If we were to hold appellants liable for invasion of privacy on these facts, we would establish the proposition that one who receives information from an intruder, knowing it has been obtained by improper intrusion, is guilty of a tort. In an untried and developing area of tort law, we are not prepared to go so far. A person approached by an eavesdropper with an offer to share in the information gathered through the eavesdropping would perhaps play the nobler part should he spurn the offer and shut his ears. However, it seems to us that at this point it would place too great a strain on human weakness to hold one liable in damages who merely succumbs to temptation and listens.

Of course, appellants did more than receive and peruse the copies of the documents taken from appellee's files; they published excerpts from them in the national press. But in analyzing a claimed breach of privacy, injuries from intrusion and injuries from publication should be kept clearly separate. Where there is intrusion, the intruder should generally be liable whatever the content of what he learns. An eavesdropper to the marital bedroom may hear marital intimacies, or he may hear statements of fact or opinion of legitimate interest to the public; for purposes of liability that should make no difference. On the other hand, (where the claim is that private information concerning plaintiff has been published, the question of whether that information is genuinely private or is of public interest should not turn on the manner in which it has been obtained.) Of

---

19. Appellants have argued that appellee's employees and former employees committed neither conversion nor trespass nor invasion of privacy, because their actions are privileged by a public policy in favor of exposing wrongdoing. See Restatement (Second) of Agency § 395, Comment f (1958):

"An agent is privileged to reveal information confidentially acquired by him in the course of his agency in the protection of a superior interest of himself or of a third person. Thus, if the confidential information is to the effect that the principal is committing or is about to commit a crime, the agent is under no duty not to reveal it. * * *"

And compare Code of Ethics for Government Service, House Doc. No. 103, 86th Cong., 1st Sess. (1958): "Any person in government service should: * * * (IX) Expose corruption wherever discovered."

20. Dodd v. Pearson, supra Note 2, 279 F. Supp. at 102.

On oral argument, counsel for appellee attempted to argue that the District Court's grant of summary judgment on the issue of liability was based on some active participation in the taking of the documents on the part of appellants, rather than the mere knowing reception of the copies. The District Court's statement of essential facts gives no support to this contention, and it is laid to rest by the following colloquy between appellee's counsel and the District Judge shortly before summary judgment was granted:

THE COURT: You are asking for summary judgment on the theory that merely receiving the documents is sufficient to make them tort feasors.

MR. SONNETT: It is more than that, Your Honor * * *.

Now, here I remind Your Honor that Anderson's secretary, it is undenied, Miss Ginn, participated in the secret copying of the documents.

THE COURT: I am not going to decide the vital rights of either party on a little difference in immaterial detail.

As I read your statement of facts, and if I misread it I want you to tell me, you are basing your case for summary judgment on the ground that an unlawful act was committed by the receipt of stolen letters.

MR. SONNETT: Knowingly.

THE COURT: Knowing them to have been stolen.

MR. SONNETT: And publicizing them; both.

THE COURT: Well, of course.

course, both forms of invasion may be combined in the same case.

■ Here we have separately considered the nature of appellants' publications concerning appellee, and have found that the matter published was of obvious public interest. The publication was not itself an invasion of privacy. Since we have also concluded that appellants' role in obtaining the information did not make them liable to appellee for intrusion, their subsequent publication, itself no invasion of privacy, cannot reach back to render that role tortious.

## II

The District Court ruled that appellants' receipt and subsequent use of photocopies of documents which appellants knew had been removed from appellee's files without authorization established appellants' liability for conversion. We conclude that appellants are not guilty of conversion on the facts shown.

Dean Prosser has remarked that "[c]onversion is the forgotten tort." [21] That it is not entirely forgotten is attested by the case before us. History has largely defined its contours, contours which we should now follow except where they derive from clearly obsolete practices or abandoned theories.[22]

Conversion is the substantive tort theory which underlay the ancient common law form of action for trover. A plaintiff in trover alleged that he had lost a chattel which he rightfully possessed,[23] and that the defendant had found it and converted it to his own use. With time, the allegations of losing and finding became fictional, leaving the question of whether the defendant had "converted" the property the only operative one.[24]

■ The most distinctive feature of conversion is its measure of damages, which is the value of the goods converted.[25] The theory is that the "converting" defendant has in some way treated the goods as if they were his own, so that the plaintiff can properly ask the court to decree a forced sale of the property from the rightful possessor to the converter.[26]

■ Because of this stringent measure of damages, it has long been recognized that not every wrongful interference with the personal property of another is a conversion.[27] Where the intermeddling falls short of the complete or very substantial deprivation of possessory rights in the property, the tort committed is not conversion, but the lesser wrong of trespass to chattels.[28]

The Second Restatement of Torts has marked the distinction by defining conversion as:

"* * * [A]n intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the

21. Prosser, The Nature of Conversion, 42 Corn.L.Q. 168 (1957).

22. Cf. id. at 169: "The hand of history lies heavy upon the tort of conversion."

23. A threshold question, not briefed by either party and hence not decided by us, is the nature of the property right held by appellee in the contents of the files in his Senate office. Those files, themselves paid for by the United States, are maintained in an office owned by the United States, by employees of the United States. They are meant to contribute to the work of appellee as an officer of the United States. The question thus is not entirely free from doubt whether

appellee has title to the contents of the files or has a right of exclusive possession of those contents, or is a bailee, or even a mere custodian of those contents.

24. See generally Ames, The History of Trover, 11 Harv.L.Rev. 277, 374 (1898).

25. 1 F. Harper & F. James, The Law of Torts § 2.36 (1956).

26. Prosser, supra Note 21, 42 Corn.L.Q. at 170.

27. See e. g., Fouldes v. Willoughby, 151 Eng.Rep. 1153 (Exch. 1841).

28. Prosser, supra Note 21, 42 Corn.L.Q. at 170–173.

actor may justly be required to pay the other the full value of the chattel."[29] Less serious interferences fall under the Restatement's definition of trespass.[30]

■■■■■ The difference is more than a semantic one. The measure of damages in trespass is not the whole value of the property interfered with, but rather the actual diminution in its value caused by the interference.[31] More important for this case, a judgment for conversion can be obtained with only nominal damages, whereas liability for trespass to chattels exists only on a showing of actual damage to the property interfered with.[32] Here the District Court granted partial summary judgment on the issue of liability alone, while conceding that possibly no more than nominal damages might be awarded on subsequent trial. Partial summary judgment for liability could not have been granted on a theory of trespass to chattels without an undisputed showing of actual damages to the property in question.

■■■■ It is clear that on the agreed facts appellants committed no conversion of the physical documents taken from appellee's files. Those documents were removed from the files at night, photocopied, and returned to the files undamaged before office operations resumed in the morning. Insofar as the documents' value to appellee resided in their usefulness as records of the business of his office, appellee was clearly not substantially deprived of his use of them.

■■■■ This of course is not an end of the matter. It has long been recognized that documents often have value above and beyond that springing from their physical possession.[33] They may embody information or ideas whose economic value depends in part or in whole upon being kept secret. The question then arises whether the information taken by means of copying appellee's office files is of the type which the law of conversion protects. The general rule has been that ideas or information are not subject to legal protection,[34] but the law has developed exceptions to this rule. Where information is gathered and arranged at some cost and sold as a commodity on the market, it is properly protected as property.[35] Where ideas are formulated with labor and inventive gen-

---

29. Restatement (Second) of Torts § 222A (1) (1965).

30. *Id.*, § 217: "A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another."

31. 1 F. Harper & F. James, *supra* Note 25, § 2.6.

32. "To support an action of trespass to a chattel where the invasion of interests does not result in its destruction or in a dispossession thereof, it was early held there must be some physical harm to the chattel or to its possessor. Unlike the action of trespass quare clausum fregit in the case of land, no action could be maintained for a mere harmless intermeddling with goods. The possessor's proprietary interest in the inviolability of his personal property did not receive that protection which the similar interest in the possession of land or the dignitary interest in the inviolability of the person receives. * * *"
1 F. Harper & F. James, *supra* Note 25, § 2.3. (Footnotes omitted.)

33. United States v. Bottone, 2 Cir., 365 F. 2d 389, cert. denied, 385 U.S. 974, 87 S. Ct. 514, 17 L.Ed.2d 437 (1966).

34. *See* International News Service v. Associated Press, 248 U.S. 215, 246, 39 S. Ct. 68, 63 L.Ed. 211 (1918) (opinion of  Mr. Justice Holmes).
The traditional rule has been that conversion will lie only for the taking of tangible property, or rights embodied in a tangible token necessary for the enforcement of those rights. *See* 1 F. Harper & F. James, *supra* Note 25, § 2.13; Annot., Property—Subject to Conversion, 44 A.L.R.2d 927 (1955); Mackay v. Benjamin Franklin Realty & Holding Co., 288 Pa. 207, 135 A. 613, 50 A.L.R. 1164 (1927). This overly restrictive rule has recently been relaxed in favor of the reasonable proposition that any intangible generally protected as personal property may be the subject matter of a suit for conversion. See Evans v. American Stores Co., Philadelphia Ct. Common Pleas, 3 Pa.Dist. & Co.2d 160 (1955).

35. International News Service v. Associated Press, *supra* Note 34.

ius, as in the case of literary works [36] or scientific researches,[37] they are protected. Where they constitute instruments of fair and effective commercial competition, those who develop them may gather their fruits under the protection of the law.[38]

■ The question here is not whether appellee had a right to keep his files from prying eyes, but whether the information taken from those files falls under the protection of the law of property, enforceable by a suit for conversion. In our view, it does not. The information included the contents of letters to appellee from supplicants, and office records of other kinds, the nature of which is not fully revealed by the record. Insofar as we can tell, none of it amounts to literary property, to scientific invention, or to secret plans formulated by appellee for the conduct of commerce. Nor does it appear to be information held in any way for sale by appellee, analogous to the fresh news copy produced by a wire service.[39]

■ Appellee complains, not of the misappropriation of property bought or created by him, but of the exposure of information either (1) injurious to his reputation or (2) revelatory of matters which he believes he has a right to keep to himself. Injuries of this type are redressed at law by suit for libel and invasion of privacy respectively, where defendants' liability for those torts can be

established under the limitations created by common law and by the Constitution.[40]

Because no conversion of the physical contents of appellee's files took place, and because the information copied from the documents in those files has not been shown to be property subject to protection by suit for conversion, the District Court's ruling that appellants are guilty of conversion must be reversed.

So ordered.

TAMM, Circuit Judge (concurring):

Some legal scholars will see in the majority opinion—as distinguished from its actual holding—an ironic aspect. Conduct for which a law enforcement officer would be soundly castigated is, by the phraseology of the majority opinion, found tolerable; conduct which, if engaged in by government agents would lead to the suppression of evidence obtained by these means, is approved when used for the profit of the press. There is an anomaly lurking in this situation: the news media regard themselves as quasi-public institutions yet they demand immunity from the restraints which they vigorously demand be placed on government. That which is regarded as a mortal taint on information secured by any illegal conduct of government would appear from the majority opinion to be permissible as a technique or modus operandi for the journalist. Some will find this confusing, but I am not free to act on my own views under the doctrine of

---

36. This protection is developed by the branch of the law known as common-law copyright, which reserves to an author the right of first publication of his work. *See generally* Annot., Literary or Artistic Property Rights, 23 A.L.R.2d 244 (1952).

37. *See, e. g.,* United States v. Bottone, *supra* Note 33 (employees who sold photocopies of documents describing drug company's methods of manufacture con-

victed of transporting stolen goods across state lines).

38. *See, e. g.,* Evans v. American Stores Co., *supra* Note 34.

39. *See* International News Service v. Associated Press, *supra* Note 34.

40. We have held that appellee is not entitled to summary judgment for invasion of privacy. Appellee originally sued appellants for libel, but has dropped this claim during the course of the litigation.

stare decisis which I consider binding upon me.

I concur, therefore, in Judge Wright's disposition of this case albeit I have some difficulty in concluding that the appellee would be without legal remedy if the entire factual situation herein were before us on pleadings encompassing all possible legal aspects suggested by the facts. Our review is, however, confined to a limited area, compressed by the amended complaint, restricted by certain stipulations, and curbed by our consideration only of the propriety of the trial court's action upon a motion for summary judgment. We must predicate our judgment upon the record as it comes to us, not upon some theoretical or philosophical idea of what the record might have been had the pleadings and the record in the trial court presented us with a wide latitude for study and a multiple selection of possible dispositions. Upon the present record we have more voice than power.