## FURASH & COMPANY, INC., Plaintiff,

v.

## Kathleen C. McCLAVE, et al., Defendants.

### No. CIV. 99–CV–00414(LFO).

United States District Court, District of Columbia.

Jan. 4, 2001.

Jed L. Babbin, Sharon L. Babbin, Tighe, Patton & Babbin, PLLC, Washington, DC, for Plaintiff.

George A. Lehner, Charles H. Carpenter, Pepper & Hamilton, Washington, DC, for Defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Furash & Company ("Furash"), a consulting firm which, during the events giving rise to this case, primarily served clients in the financial services business, filed this action against its former President and Chief Executive Officer, Kathleen McClave ("McClave"), and a competitor, Towers, Perrin, Foster & Crosby, Inc. ("Towers"), a consulting firm that provides services to insurance, finance, banking and

other clients. Generally, Furash alleges that McClave and Towers, McClave's present employer, deprived Furash of its business by inducing Furash's current and prospective clients to transfer their business to Towers, by enticing Furash's key employees to leave Furash and accept employment at Towers, and by having McClave take files, customer lists, and other proprietary information and work product from Furash to Towers. The complaint includes claims against McClave individually for fraud and breach of fiduciary duty, and against Towers and McClave for intentional, and alternatively, negligent, interference with Furash's contracts and prospective contractual relations, conspiracy, unfair competition, and conversion. McClave has also filed a third party complaint and counterclaim relating to an unpaid bonus she claims she earned for her work at Furash in 1998. Pending are motions filed by each defendant for summary judgment on all claims, and a motion filed by McClave for summary judgment on her third party complaint and counterclaim.

## I.

The following facts are undisputed.

### A. McClave's Employment at Furash

McClave began working at Furash in 1983 and continued there until 1993, when she left for a position at the Wharton School, University of Pennsylvania. While at the Wharton School, McClave continued working part-time at Furash. In July 1996, she returned to Furash full time as the Vice Chairman and Co–Chief Operating Officer, jointly operating the company with Rolland Johannsen, Furash's Chairman and Chief Operating Officer. Plaintiff's Consolidated Opposition to Defendants' Motion for Summary Judgment, pp. 3–4 ("Pl.Opp'n").

In December 1997, Furash's owner, Headway Capital Industries, sold Furash to InterBank Communications Inc., part of a group of closely related companies owned or operated by Simon Hershon and Ehud Laska, known as the Interbank Companies ("Interbank"). In February 1998, after a three month transition period, Johannsen left Furash, and McClave became President and Chief Executive Officer. Pl. Opp'n at 4. She served as President and Chief Executive Officer from January 1, 1998 until December 31, 1998 pursuant to a contract with Interbank. She continued working at Furash for a brief time in January 1999 after her contract expired. McClave's contract with Interbank did not include a covenant not to compete. Contract Between McClave and Interbank, Def.'s Statement of Material Facts, Ex. A.

Sometime during the 1997–1999 period, Furash began experiencing financial difficulties, and Hershon and Laska directed McClave to attempt to find a company to purchase or merge with Furash. McClave spoke with a number of companies, including Towers, Speer and Associates, "Lee–Mack", "AMS", "Total Research", "Dove", and "Treasury Strategies", but was unable to consummate a sale or merger. McClave Dep., Pl. Opp'n, Ex. 1, p. 102–103. Plaintiff claims that, while meeting with these companies, McClave acted on her own behalf by seeking employment for herself outside of Furash, rather than seeking a partner or buyer, as Furash's owners had directed.

### B. McClave's Employment Discussions with Towers

In 1998, Towers decided to expand its financial consulting "Tillinghast" subsidiary, by which McClave is now employed. McNees Dep., Pl. Opp'n., Ex. 5, pp. 35–36. As a result of this decision, in May or June 1998, Don McNees, director of Towers' banking, investment management, and securities practice, requested that an executive recruiter contact McClave regarding the possibility of employment at Towers. Id. at 31–32. McClave responded through the recruiter that she was not interested in being hired at that time, but that she

wanted to meet with Towers concerning a transaction with Furash.' *Id.* When McClave and McNees met in June 1998, McClave informed McNees of Furash's interest in pursuing some type of acquisition or partnership with Towers, and McNees suggested that instead of a corporate transaction, McClave could leave Furash and join Towers. Later, in July 1998, McNees informed McClave of Towers' final rejection of a deal with Furash. *Id.* at 34–35.

In September 1998, McClave and McNees again began discussing employment opportunities. In connection with his recruiting efforts, McNees gave McClave a set of guidelines entitled "INSTRUCTIONS TO GIVE A CANDIDATE FOR HIRE FROM A COMPETITOR." The instructions listed the following:

Clients
- Should not tell clients he is leaving employer until he has told employer.
- Should not ask clients to follow him.
- Should cooperate with employer's efforts/instructions regarding transitioning their clients to new employees to competitor.
- Should not tell or suggest to clients that they request their files or anything.

Information
- Should not take anything with him—originals or copies/software no client information no copies of work he has done no competitor information—regarding company, plans, financials

Employees
- Should not be the go-between between TP [Towers Perrin] and others at competitor.
- Should not encourage others to leave.

If asked about TP, should give them the name of someone at TP who they can call.

Def. Statement of Material Facts, Ex. B. Discussions continued at an October 1998 lunch meeting where McClave met with

McNees and Tricia Guinn, McNees' supervisor. Negotiations between McClave and Towers continued, and in early December 1998, Towers sent McClave a formal employment offer, which contained Towers' standard covenant not to compete. Should McClave leave Towers, this non-compete clause would have prohibited her from competing against Towers for a period of time. Unwilling to accept the covenant, McClave proposed that certain companies, with which she had close relationships, be excepted from the non-compete covenant. Towers agreed to a "carve-out" from the non-compete clause for these companies, all of which were Furash clients.

### C.  McClave's Departure From Furash

On or about January 4, 1999, McClave notified Laska and Hershon that she was resigning her position at Furash for a position at Towers. In meetings on January 5, 1999, McClave, Laska, and Mary Beth Sullivan of Furash decided that they would delay announcing McClave's resignation to the employees of Furash to allow time to develop a transition strategy, and McClave agreed to remain in her position during that period. Three days later, Laska asked Johannsen if he would return to Furash. Johannsen accepted the offer, and on January 15, 1999, he announced to the Furash staff that McClave was leaving the company. On or about January 19, 1999, he returned as Furash's President and Chief Executive Officer.

After her departure, McClave retained her laptop computer and the data it contained, her rolodex, and three boxes of documents, which were at her home office. Upon Furash's request, the computer was returned to Furash with the client-related data and files deleted. The documents were also returned, with Towers' in-house counsel retaining a copy of the documents.

### D.  McClave's Discussions With Clients

On September 15, 1998, well before her departure, McClave began discussions on behalf of Furash with United Services

Automobile Association ("USAA"), an automobile and home insurance company, concerning a project involving the development of a branch distribution system for their savings bank business. Between September and December 1998, McClave, with the assistance of other Furash employees, including Rosemary King, worked to develop a proposal for USAA. In December 1998, USAA told McClave to proceed with the project, but no written contract between USAA and Furash was signed. At McClave's direction, on December 30, 1998, an invoice was sent to USAA for an initial retainer in the amount of $70,000. Although USAA never paid this invoice, in January 1999, Furash devoted billable time to the USAA project.

After McClave left for Towers, Johannsen tried to convince USAA that Furash had the resources to continue fulfilling its needs. But USAA was insistent on McClave's continued involvement. With Towers' approval, Johannsen attempted to negotiate an arrangement whereby Furash's employee, King, would continue managing the day-to-day USAA business while McClave would handle high level client contacts. While these discussions occurred, however, King resigned from Furash to accept employment with Towers. With King's departure, Furash was unable to consummate an arrangement with USAA, and USAA retained Towers to finish the project.

In the Fall of 1998, McClave proposed a project to improve the performance of Fleet Bank's ("Fleet") retail delivery system. On behalf of Furash, McClave continued soliciting Fleet for projects through November and December. On January 11, 1999, seven days after McClave submitted her formal letter of resignation to Furash, she sent a proposal to Fleet soliciting a project to enhance the bank's sales processes and measure performance. In the proposal, McClave set out Furash's project with Fleet and represented that she would take personal responsibility for the project

and that King would be responsible for day-to-day project management. Letter to Fleet, Pl. Opp'n, Ex. 20. Fleet never signed a contract with Furash, and upon McClave's departure, it ended its relationship with Furash. Fleet did not retain Towers for the proposed project.

## II.

### A. *Breach of Fiduciary Duty (McClave)*

Two cases, *Mercer Management Consulting v. Wilde*, 920 F.Supp. 219 (D.D.C.1996) and *Riggs Investment Management Corp. v. Columbia Partners*, 966 F.Supp. 1250 (D.D.C.1997), apply applicable common law principles concerning fiduciary duty. "Corporate officers and directors owe 'an undivided and unselfish loyalty to the corporation' such that 'there shall be no conflict between duty and self-interest.'" *Mercer*, 920 F.Supp. at 233 (quoting *Guth v. Loft*, 5 A.2d 503, 510 (Del.1939)). However, "an agent can make arrangements or plans to go into competition with his principal before terminating his agency, provided no unfair acts are committed or injury done to his principal." *Mercer*, 920 F.Supp. at 233 (quoting *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del.1980)). In preparing to compete, an employee may not commit wrongful acts, "such as misuse of confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees." *Id.* "The ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts of the particular case." *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 569–70 (1978) (quoted with approval in *Mercer*, 920 F.Supp. at 233).

Furash argues that McClave breached her duty of loyalty by allegedly: (1) violating her duty to disclose to Furash her plan to leave at the expiration of her

contract even though she had decided much earlier to resign and had informed Towers of her plan; (2) soliciting client work for herself rather than for Furash by inducing client loyalty to her personally rather than to the company; (3) prior to her leaving Furash, soliciting at least one Furash employee, Rosemary King; and (4) acting on her own behalf by discussing her potential employment opportunities with other companies in the course of discussing potential transaction opportunities for Furash. Furash submits evidence that during one such meeting with Speer and Associates, McClave discussed her short time commitment to Furash and offered to attract key Furash employees to that consulting firm. Speer Affidavit, ¶¶ 3, 4, Pl. Opp., Ex. 29.

McClave disputes these claims and argues that she did not decide to leave Furash until just before she notified the company of her departure. She also claims that the expiration date of her employment contract put Furash on notice of the possibility of her departure. McClave also disputes plaintiff's claim that she was soliciting work for herself when discussing projects with her clients. She asserts that the consulting business is built on personal contacts, and that her personal devotion to the client was necessary for Furash to secure its contracts with these companies. McClave claims that she did not improperly recruit Ms. King or any other Furash employee. She also contends that she never had improper discussions during her meetings with competitors.

The material facts of Furash's claim for breach of fiduciary duty are largely in dispute. Plaintiff has set forth evidence of McClave's involvement with King's departure from Furash, McClave's actions while searching for a buyer or partner for Furash, her actions in soliciting work from clients, and the date of her decision to leave Furash. This evidence might lead a reasonable jury to find that these activities constitute a breach of fiduciary duty. Therefore, McClave's motion for summary

judgment on the breach of fiduciary duty claim is denied in an accompanying order.

B. *Conspiracy (McClave and Towers)*

■ Furash alleges that Towers and McClave conspired to breach McClave's fiduciary duty by discussing and agreeing that McClave would improperly attract Furash's clients to Towers. As evidence of this agreement, Furash refers to the following undisputed facts and evidence: (1) a letter Towers sent to McClave, which listed as one of her Preliminary Goals and Objectives that she "work to transfer existing client relationships in banking community and to develop new relationships with Tillinghast—Towers Perrin cornerstone clients in the banking sector." Pl. Opp'n, Ex. 9; (2) the fact that McClave's first year compensation was based on the business she generated, including business from former Furash clients; (3) notes taken by a Towers employee, Susan Collins, during a conversation with Towers' in-house counsel, which stated "will not put in writing ... conspiracy lawsuit." Pl.'s Opp'n, Ex. 8; (4) the "carve out" for McClave's previous clients in the non-compete provision of her contract with Towers; and (5) the fact that approximately 65% of McClave's business in her first year at Towers was service to former Furash clients. Pl. Opp'n, Ex. 21.

■ Civil conspiracy requires an agreement between two or more parties to take part in an unlawful action or a lawful action in an unlawful manner, and an overt tortious act in furtherance of the agreement that causes injury. *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C.Cir.1983); *International Underwriters, Inc. v. Boyle*, 365 A.2d 779, 784 (D.C.1976). If Furash can establish that Towers participated in or induced the alleged wrongful actions of McClave pursuant to an agreement, Towers is a conspirator and is liable for the damages proximately caused by these wrongs. *See International Underwriters*, 365 A.2d at 784. In the District of Columbia, civil conspiracy is not an individual tort; rather it is a means for establishing

vicarious liability for the underlying tort. *Halberstam,* 705 F.2d at 479.

Even if McClave breached her duty, a reasonable jury could not find Towers and McClave liable for civil conspiracy. The evidence Furash lists to support its claim for conspiracy is insufficient to show that Towers participated or induced any of McClave's allegedly wrongful acts pursuant to an agreement. It might be reasonable for a jury to infer that Towers was aware that McClave had no non-compete agreement with Furash. But, the jury would also have to consider the fact strongly exculpatory of Towers, namely the several precautions specifically presented in the memorandum Towers gave McClave when discussions began. Def. Mot., Ex. B. Towers' goals for McClave, her compensation formula, and the non-compete clause are merely circumstantial evidence which, even when considered collectively, would not lead a reasonable jury to conclude that Towers agreed to participate in the alleged wrongful acts. Likewise, Susan Collins' notes are insufficient to persuade a reasonable trier of fact that any such agreement or relationship existed. An accompanying order grants defendants' summary judgment motions on the conspiracy claim.

### C. *Fraud (McClave)*

To prove civil fraud, a plaintiff must show a false representation of a material fact which is made with knowledge of the falsity with the intent to deceive on which the victim took action in justified reliance upon the misrepresentation. *Pyne v. Jamaica Nutrition Holdings, Ltd.,* 497 A.2d 118, 131 (1985) (citing *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C.), cert. denied, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978)); see also *Howard v. Riggs Nat'l Bank,* 432 A.2d 701, 706 (D.C. 1981). Nondisclosure of material information may constitute fraud, especially where there is a duty to disclose. *Rothenberg v. Aero Mayflower Transit Co.,* 495 F.Supp. 399, 406 (D.D.C.1980). As an officer of Furash, McClave had a duty to disclose material information. Furash alleges that

McClave's misrepresentations include her: (1) claims that she continued to promote business for Furash, even though she also used her client meetings for her own benefit; (2) statements that she attempted to find a merger or acquisition opportunity when she was actually searching for her own job opportunity; (3) representations that certain invoices would be paid by clients, because of contracts with those clients, when she knew that there were no contracts and that Furash would not be paid; and (4) failure to disclose her plans to leave Furash, surprising the company by leaving just before a pending merger, resulting in the failure of the merger and Furash. Furash states that McClave's intent can be inferred from her statements to Johannsen that she knew she could not be replaced and that Furash would have no business without her. Pl. Opp'n, Ex. 2, pp. 47–51.

McClave denies the facts alleged by Furash and claims that she did not decide to join Towers until her contract with Furash expired, and that she announced her intention to leave in early January, only days after she had finally made her decision. Further, McClave claims that Furash's reliance on her silence was unreasonable, given Furash's knowledge that her contract with Interbank would expire at the end of December. McClave also asserts that Furash cannot show any actual damage from her alleged misrepresentations.

Furash has set forth numerous disputed facts that could lead a reasonable jury to find fraud on the part of McClave, including her alleged statements concerning her discussions with potential merger partners, the date of her decision to leave Furash for Towers, and her statements concerning the collectability of certain accounts receivable. Summary judgment on the fraud claim must be denied.

### D. *Intentional Interference with Furash's Contracts and Prospective Contractual Relations (McClave and Towers)*

To sustain a claim for intentional interference with contract and busi-

ness relations Furash must establish (1) the existence of a business relationship; (2) defendants' knowledge of the business relationship; (3) intentional interference with the relationship by defendants; and (4) resulting damages. *Mercer,* 920 F.Supp. at 239. Intentional interference with prospective economic advantage requires intentional and improper interference with "business expectancies, not grounded on present contractual relationships, but which are commercially reasonable to anticipate." *Carr v. Brown,* 395 A.2d 79, 84 (D.C.1978); *see* Restatement (Second) of Torts § 766B. Furthermore, the defendant's interference must be improper. "Competitive activity does not by itself constitute intentional interference with prospective business advantage, unless accomplished by wrongful or improper means, such as fraud." *Mercer,* 920 F.Supp. at 239 (quoting *International City Mgt. Ass'n Ret. Corp. v. Watkins,* 726 F.Supp. 1, 6 (D.D.C.1989)).

Furash claims that McClave, with the encouragement of Towers, improperly solicited employees and tried to ensure the loyalty of Furash's clients, *viz.,* USAA and Fleet, to her personally, not to Furash. Furash argues that it had a long history with consulting clients in the financial services market, that defendants were aware of those relationships, and that those relationships would have continued but for the defendants' interference.

As discussed earlier, there is no evidence that Towers engaged in any intentional, wrongful conduct on its part that led to any breach of contract. However, the facts as to whether McClave improperly solicited clients for her personal benefit in order to interfere with Furash's business relationships are largely in dispute. A reasonable jury might find that McClave's alleged breach of fiduciary duty destroyed Furash's client relationships. An accompanying order denies McClave's motion for summary judgement on the tortious interference claims, and grants Towers' motion.

### E. Negligent Interference with Contract and Prospective Contractual Relations (McClave and Towers)

As an alternative to its claim for intentional interference, plaintiff contends that defendants negligently interfered with its contracts and prospective contractual relations. Plaintiff concedes that the District of Columbia has not explicitly recognized the tort of negligent interference with contract and prospective contractual relations. Pl. Opp'n at 64. Nonetheless, plaintiff states that other jurisdictions have recognized such a cause of action, *see, e.g., J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979), and argues that there are indications that the District of Columbia would recognize such a tort, even in commercial settings. *See Bowler v. Stewart–Warner Corp.,* 563 A.2d 344, 355 (D.C.1989) (discussing the availability of recovery for economic loss in products liability suits).

Plaintiff's arguments are not persuasive. The District of Columbia has not authorized tort recovery for purely economic losses in a contract setting. Nor has the District recognized the specific tort of negligent interference with contract or prospective contractual relations. *See Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 309, 48 S.Ct. 134, 72 L.Ed. 290 (1927) ("... a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong."); *Potomac Plaza Terraces v. QSC Products, Inc.,* 868 F.Supp. 346 (D.D.C.1994) ("While District of Columbia courts have not decided whether economic loss is recoverable, a majority of other jurisdictions rejects claims for economic loss based on negligence, strict liability or both." (citations omitted)). Neither has the Restatement (Second) of Torts recognized such a tort:

One is not liable to another for pecuniary harm not deriving from physical

harm to the other, if that harm results from the actor's negligently

(a) causing a third person not to perform a contract with the other, or

(b) interfering with the other's performance of his contract or making the performance more expensive or burdensome, or

(c) interfering with the other's acquiring a contractual relation with a third person.

§ 766C. In an extended discussion on this Restatement section, the Third Circuit stated that " 'it is the character of the contract or prospective interest itself that has led courts to refuse to give the interest protection against negligent interference.' " *Getty Ref. and Mktg. Co. v. MT Fadi B*, 766 F.2d 829, 831–32 (3d Cir.1985) (quoting Restatement (Second) of Torts § 766C cmt. a). " 'The extremely variable nature of the relations between the parties, the fear of an undue burden upon the defendant's freedom of action, the probable disproportion between the large damages that might be recovered and the extent of the defendant's fault, and perhaps in some cases the difficulty of determining whether the interference has in fact resulted from the negligent conduct,' all have influenced the courts against permitting recovery." *Id.* (quoting Restatement (Second) Torts § 766C, cmt. a). "The courts today, with the exception of one or two isolated cases, have adopted a bright line rule that precludes recovery of the loss of financial benefits of a contract or of prospective trade because of negligent interference with a contractual relationship absent physical damage or injury." *Id.* at 832. In *Getty*, the Third Circuit also quoted Professors Prosser and Keeton:

> The policy against recovery based on negligence is rooted at least in part on what Professor James has called the "pragmatic" objection, that while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, or by contract, or by other business planning devices. The courts have generally followed this policy and the rather limited and narrow exceptions have had virtually no impact on the law.

*Id.* (quoting W. Prosser & W. Keeton, The Law of Torts 1001 (5th Ed.1984)).

In light of the long history against recognition of the tort of negligent interference with contract or prospective contractual advantage and the reasons against such recognition, plaintiff's arguments and the facts of this case do not justify extension of liability for such a tort for the first time in this jurisdiction. Therefore, the defendants' motions for summary judgment on this claim are granted in an accompanying order.

### F. *Unfair Competition*

In essentially a restatement of Furash's other claims, Furash claims that McClave engaged in unfair competition by soliciting Furash employees to join Towers and by developing customer relationships for herself and Towers while at Furash, and that Towers knowingly encouraged McClave's actions. Unfair competition is not defined in terms of specific elements, but by the description of various acts that would constitute the tort if they resulted in damage. *Business Equip. Ctr. v. DeJur–Amsco Corp.*, 465 F.Supp. 775, 788 (D.D.C. 1978). These acts include interference with access to business. *See B & W Mgmt. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n. 3 (D.C.1982).

Furash repeats the allegations presented in its claims for breach of fiduciary duty and interference with contract. For the reasons discussed in those sections, McClave's motion for summary judgment is denied. Evidence of Towers' involvement in McClave's actions is conspicuously lacking; therefore, Towers' motion is granted on the unfair competition claim.

## 58

### G. *Conversion*

█ Furash alleges that McClave and Towers converted its intellectual property because after her departure from Furash, McClave retained three boxes of Furash documents, a laptop containing Furash documents, and her rolodex. Furash claims that McClave kept these boxes, which contained a list of Furash's revenues by client for 1993–1998, revenue projections for each of Furash's consultants, business reports, minutes of board meetings, and USAA work reports, after her departure from Furash. When Furash requested the return of the documents, McClave turned the documents over to Towers' in-house legal department. The legal department copied the documents and returned McClave's copy to Furash. McClave also turned her laptop over to Furash after a Towers' information services employee deleted its files. McClave retained her rolodex.

Furash states that McClave's release of this confidential information to Furash's competitor, Towers, reduced the value of the confidential information and gave Towers the benefit of the information. Furash contends that McClave used the confidential information in the documents and the computer in her work for USAA while at Towers, and that Towers used the information in McClave's rolodex for marketing purposes, specifically, to conduct a mailing announcing McClave's joining Towers.

█ Conversion is the unlawful exercise of ownership, dominion, or control over the personal property of another in denial or repudiation of that person's rights thereto. *O'Callaghan v. District of Columbia*, 741 F.Supp. 273, 279–280 (D.D.C.1990). Where the defendant's initial possession is lawful, the long-settled rule is that in the absence of other facts and circumstances independently establishing conversion, a demand for return is necessary to show the adverse nature of the possession. *Shea v. Fridley*, 123 A.2d 358, 361 (D.C.1956). Nor can an owner state a claim for conversion when it retains originals or other copies of documents another improperly uses because the owner is not deprived of the beneficial use of the information. *Pearson v. Dodd*, 410 F.2d 701, 706 (D.C.Cir.1969), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969). In *Pearson*, two employees of Senator Thomas Dodd broke into his office and took documents from his files. They copied the documents overnight, returned the originals to his files, and turned the copies over to columnists. The Court concluded that this conduct was not conversion because Dodd was not substantially deprived of his use of the documents, stating that "[w]here the intermeddling falls short of the complete or very substantial deprivation of possessory rights in the property, the tort committed is not conversion ..." *Id.* at 706.

McClave, who occasionally worked out of her home office, legitimately acquired the Furash documents. When requested, she returned the documents to Furash, with Towers' in-house legal counsel keeping a copy in case of litigation. Although these documents were returned, Furash claims that the similarity of the Furash and Towers work product for USAA could lead to a reasonable inference that the documents, specifically the USAA work plan, were used by McClave for the benefit of Towers, in violation of Furash's rights. Pl. Opp. 58.

Although in possession of the documents, neither Towers nor McClave denied Furash's rights to the information in the documents. For ought that appears, Furash did not retain other copies of the files, and McClave's possession of the documents did not interfere with Furash's ability to obtain or conduct its business. Towers admits that it used the information in McClave's rolodex to announce her joining Towers. The rolodex may have contained the addresses of clients with whom McClave had worked, but there is no evidence that the names and addresses of the financial institutions could not have been found easily, nor is there evidence that

Furash did not retain the identical information in its customer list. While not necessary to this decision, it is arguable that McClave, rather than Furash, owned her rolodex and the information therein. It is clear that neither Towers' use of the addresses in McClave's rolodex in the announcement mailing nor its counsel's retention of a copy of the documents in the case of litigation, without evidence of Towers' use of the documents, amounts to conversion.

Finally, Furash's claim that McClave and Towers converted the value of the USAA work plan also fails. There is no evidence to contradict King's testimony that she recreated the work plan based on her knowledge of the project, nor is there evidence to contradict McClave's testimony that she was given a copy of the work plan by USAA. Furash has not presented evidence to contradict these claims, and these explanations are not exclusive of each other. Defendants' motions as to the conversion claim are granted in an accompanying order.

## III.

McClave's employment contract with Furash and the third party defendants, the Interbank Companies, entitled her to a bonus equal to "Five Percent (5%) of ... any and all revenues of Furash & Co. recognized by Furash during the period commencing January 1, 1998 and ending December 31, 1998 irrespective of the source of the business, minus One Million Dollars." Def. Mot., Ex. A. The parties agree that McClave was not paid any bonus for 1998. In her motion for summary judgment on her third party complaint and counterclaim, McClave alleges that Furash realized revenues in 1998 of $3,300,987.75, and therefore, she is owed $115,049.38.

■■■ Under *Riggs,* no compensation is due an employee who has breached her fiduciary duty to her employer. 966 F.Supp. at 1266. As explained above, the issue of whether McClave breached her fiduciary duty remains in dispute, there-

fore, McClave's motion for summary judgment on her counterclaim and third party complaint must be denied without prejudice.