### MERCER MANAGEMENT CONSULTING, INC., Plaintiff,

v.

### Dean L. WILDE, II, et al., Defendants.

### Civil Action No. 93–0912(JHG).

United States District Court, District of Columbia.

March 29, 1996.

David Barmak, Robert Edward Sarazen, Sherman, Meehan & Curtin, Washington, DC, for plaintiff.

Paul Blankenstein, Mark Snyderman, Gibson, Dunn & Crutcher, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

After defendants Dean L. Wilde, II and Dean R. Silverman established a competing business, Dean & Co. Strategy Consultants, Inc. ("Dean & Co."), and, along with defendant Moray P. Dewhurst, left the employ of plaintiff Mercer Management Consulting, Inc. ("Mercer"), Mercer brought a ten-count complaint alleging, *inter alia*, breach of fiduciary duty, breach of contract, and tortious interference with contractual relationships. Defendants Wilde and Silverman counterclaimed for breach of contract, stemming from Mercer's alleged failure to honor an agreement to make certain payments to Wilde and Silverman.

Following denial of defendants' second motion for summary judgment (except as to one claim relating to defendant Dewhurst), this case was tried to the Court. After the trial, counsel submitted extensive proposed findings of fact and conclusions of law.[1] Upon consideration of the record and evidence introduced at trial, including the testimony of witnesses whose credibility, demeanor, and behavior the Court has had an opportunity to observe and fully evaluate, for the reasons set forth below judgment shall be entered in favor of plaintiff on its claims relating to breach of the 1982 Agreement by defendants

---

1. At the outset, the Court compliments counsel for their thorough and very helpful submissions, as well as their commendable presentation of the evidence at trial. The parties' submissions and the testimony at trial reveal that most factual matters are not disputed in this case. Rather, what is hotly disputed is the legal significance of the facts. Because most facts in the record are not disputed, this Memorandum Opinion and Order presents most of the Court's factual findings without specific attribution to a particular witness.

Dean Wilde and Dean Silverman, and in favor of defendants on all of Mercer's other claims. Judgment shall be entered in Mercer's favor on Wilde's and Silverman's counterclaim.

## I. *FINDINGS OF FACT*

Mercer is a management consulting and strategic planning company incorporated under the laws of Delaware. Mercer is an indirect subsidiary of Marsh & McLennan Companies, Inc. ("MMC"). In 1987, MMC acquired, through a subsidiary, a management consulting and strategic planning company known as Temple Barker Sloane, Inc. ("TBS"). On February 14, 1990, MMC acquired Strategic Planning Associates, Inc. ("SPA"), by merging it with TBS. The resulting company became known as Mercer Management Consulting, Inc., the plaintiff company in this case.

Defendants Wilde, Silverman, and Dewhurst were employed by SPA, and subsequently by Mercer, as management consultants.[2] Each defendant quickly rose through the ranks. Wilde joined SPA in 1980 after his graduation from the Massachusetts Institute of Technology's ("MIT's") Sloane School of Management. He became a vice president of SPA in 1984 and an executive vice-president and member of SPA's Policy Committee in 1988. Moreover, he served on Mercer's Board of Directors and Mercer's "inside board" from approximately October 1991 until his resignation on April 2, 1993.[3]

Silverman, a graduate of Columbia Law School, joined SPA in 1979 after three years in a law firm and another management consulting business. Like Wilde, Silverman became a vice president in approximately 1984, and became an executive vice president and Policy Committee member in 1988. He too

served on Mercer's Board of Directors and the "inside board" from approximately October 1991 until his resignation on April 2, 1993.

Dewhurst joined SPA in 1980 after his graduation from MIT's Sloane School of Management. He became a vice president of SPA in 1984 and served in that position until his resignation on March 15, 1993.

In 1982, Wilde, Silverman, and Dewhurst each executed an employment agreement with SPA (the "1982 Agreement"). The 1982 Agreement provides, *inter alia*, that each defendant will refrain from "render[ing] competitive services" to any client or active prospect of SPA, or from hiring or assisting in hiring any SPA employee, for a period of one year following the termination of employment with SPA. Such agreements are typical in the management consulting industry. Thomas Waylett, Chairman of Mercer Management, testified that the agreements served as Mercer's "protection that people wouldn't just walk out the door, set up in business, and take clients and employees." Tr. at 51. As part of its "due diligence" investigation prior to the TBS/SPA merger, Mercer sought to ascertain whether SPA's employees had previously signed non-solicitation agreements, and it learned of the 1982 Agreements in the course of that investigation.[4]

### A. *The 1990 Agreements*

In 1989, as a condition of the merger between TBS and SPA, Mercer required five senior employee-stockholders of SPA, including Wilde and Silverman, to enter into employment agreements ("the 1990 Agree-

---

**2.** Mercer has approximately 400 management consultant professionals.

**3.** The "inside board" is comprised of Mercer employees who sit on the Mercer Board of Directors. The inside board functions as a management committee running Mercer's day-to-day affairs.

**4.** While the 1982 Agreement does not explicitly prohibit solicitation, but rather "render[ing] competitive services" to SPA (now Mercer)

clients, at trial counsel and numerous witnesses referred to the 1982 Agreement as a non-solicitation agreement, which prohibited defendants from working for SPA's clients, as distinguished from a non-competition agreement, which would broadly prohibit competition in the same line of business. Similarly, in this Memorandum Opinion and Order, the Court refers to the 1982 Agreement as a non-solicitation agreement, even though technically the 1982 Agreement does not prohibit solicitation.

ment").[5] Wilde and Silverman each executed the 1990 Agreement in December 1989. The agreements became effective as of the merger date—February 14, 1990.

Among its key provisions, the 1990 Agreement assured continued employment at a guaranteed level of compensation for a period of three years from the date of the merger. The agreement obligated Wilde and Silverman to "perform and discharge well and faithfully the[ir] duties". Jt.Exh. 1 at ¶ 4. For a three-year period commencing on the date of the merger, the agreement prohibited Wilde and Silverman from offering competitive services within a 50–mile radius, soliciting or accepting business from any Mercer client or active prospect, or soliciting any management consulting professional to terminate employment with Mercer. *Id.* at ¶ 6.

Pivotal to the instant dispute is paragraph 14 of the 1990 Agreement, which concerns the relationship between the 1990 Agreement and prior employment agreements. Paragraph 14 states, in pertinent part:

14. *Entire Agreement.* This instrument contains the entire agreement of the parties with respect to employment following the Merger Date and supersedes all prior oral or written agreements and understandings between and among the Employee [and] the Company . . . with respect to employment following the Merger Date, except for any agreements or understandings restricting or prohibiting the competition or solicitation activities of the Employee or the use of confidential information of the Company or its clients which shall remain in full force and effect, *provided* that in the event of a conflict between the provisions of this Agreement and those of any other agreement which survive hereunder, the provisions of this Agreement shall control.

Jt.Exh. 1 at ¶ 14.

The meaning of paragraph 14 and its effect on the survival of the 1982 Agreements is paramount to Mercer's breach of contract claims. The Court previously determined that the language in paragraph 14 was subject to a number of possible interpretations,

and consequently, extrinsic evidence concerning paragraph 14's meaning was allowed. Because of the importance of this issue to the underlying claims, the evidence is recounted in some detail below.

Mercer's Chairman, Thomas Waylett, stated his objectives with respect to the 1990 Agreements as follows:

[T]o make sure that these individuals remained employees of our firm for at least three years. That if in the event they left they did not compete with us during that period. That's different from nonsolicitation. Nonsolicitation is covered by a different agreement. That we would undertake to not fire them during that period, and we would undertake to pay them not less than a certain amount of money during that period.

Tr. at 83–84. Or, in the vernacular:

I want[ed] these people's feet nailed to the floor for three years . . . [and] to have the nonsolicitation stuff survive.

Tr. at 276. Waylett further testified that he wanted the SPA agreements to be substantially the same as the agreements obtained in the TBS acquisition. He communicated these intentions to Mercer's counsel. Moreover, although he did not personally review the agreements at the time, Waylett believed the 1990 Agreements met his goals.

At the time of the SPA acquisition, Leonard DiNapoli had been Mercer's principal legal officer for approximately five years, and had overseen virtually all of the legal work for Mercer's prior acquisitions. DiNapoli was closely involved in drafting the agreements utilized in the acquisition of TBS, and he was given responsibility for negotiating the 1990 Agreements on Mercer's behalf.

According to DiNapoli, his goals in the negotiation of the 1990 Agreements were to obtain a non-competition provision for a fixed period subsequent to the merger, and in addition, to leave undisturbed whatever nonsolicitation agreements existed prior to the merger. Initially, the draft agreement contained a non-competition clause which was of

---

5. Mercer required similar agreements of key employees during the TBS acquisition. In fact,

MMC used the TBS acquisition as a template for its acquisition of SPA.

a two-year duration and commenced at the termination of employment. This version of the agreement was soundly rejected by Richard Morvillo, who represented Wilde and Silverman in the negotiations, and by Ralph DeMartino, who represented Francois deCarbonnel, another Policy Committee member, in the negotiations. Morvillo and DeMartino found both the scope and duration of the restrictions excessive.[6]

Eventually the parties reached an impasse in the negotiations. The impasse was broken by counsel's agreement to incorporate what they describe as a "three-year wasting noncompete" provision into paragraph six. Under that provision, Wilde and Silverman would be prohibited from competing with Mercer for a three-year period from the date of the merger, whether or not they were employed by Mercer. The three-year noncompete provisions were coterminous with an employment and salary guarantee.

Having reached agreement on paragraph six, the parties then turned their attention to paragraph 14. The discussions on paragraph 14 were brief in comparison to the discussions over paragraph six, which themselves were concentrated in a two- or three-week period of time due to the imminency of the merger.

As previously described, paragraph 14 provided that the 1990 Agreement represented the complete agreement of the parties, except for other agreements relating to competition, solicitation, or use of confidential information. The purpose of the "exception clause," according to DiNapoli, was to preserve any existing agreements relating to non-competition, non-solicitation, or confidential information. In the course of due diligence, Mercer had learned that all senior professionals had one-year non-solicitation agreements, and DiNapoli wished to preserve these agreements. According to DiNapoli, under the 1982 and 1990 Agreements,

Wilde and Silverman could compete after three years, "[b]ut as to solicitation, [for] one more year they had to leave alone the client base that [Mercer] bought and paid for." Tr. at 411. In other words, the 1990 Agreement broadly prohibited competition with Mercer for three years; the 1982 Agreement, which took effect once an employee left Mercer's employ, did not prohibit competition generally, but prohibited former employees from interfering with Mercer clients or employees for a one-year period following their employment.

According to Morvillo and DeMartino, they repeatedly asked DiNapoli to identify the agreements covered by the "exception clause" of paragraph 14, out of a concern that the exception clause could "swallow the rule"—meaning, presumably, that it could preserve restrictions greater than those contained in paragraph six. DiNapoli testified that he told Morvillo and DeMartino he wanted to preserve "whatever was out there," but he declined to identify the particular agreements covered by the exception clause. As he put it:

> [Morvillo] had an easy way to find out . . . He could ask his client what they signed. . . . And so I resisted identifying what it is these guys had signed, because it seemed to me he had a more direct way to find out than from me.

Tr. at 398. Morvillo and DeMartino denied that DiNapoli told him he wanted to preserve "whatever was out there." Rather, Morvillo testified that DiNapoli told him "I don't know of any other agreements that your clients have signed." Tr. at 513. DeMartino testified that DiNapoli told him "I can't tell you everything that exists out there, but I don't know of anything that would survive." Tr. at 574. These witnesses testified that DiNapoli told them he needed to preserve the exception clause as a matter of form, so that he could truthfully say the language appeared in

---

6. DeMartino testified that his client wanted a "bright line indication" of his obligations, meaning that he wanted a fixed employment period and for all obligations to cease at the termination of that period. DeMartino testified that he ad-

vised DiNapoli of this interest. In DeMartino's view, paragraph six accomplished this goal. DiNapoli did not disagree with this analysis insofar as paragraph six was concerned. DiNapoli be-

all Mercer merger agreements.[7] DiNapoli emphatically denied this assertion.

Significantly, Morvillo was not informed by his clients of the existence of the 1982 Agreements. Indeed, both Wilde and Silverman testified that they had forgotten about the agreements at the time the 1990 Agreements were being negotiated.[8] According to these witnesses, they each provided a folder of documents relating to their employment with SPA to Morvillo, but the folders did not contain the 1982 Agreements. The folders did contain, and Wilde and Silverman remembered signing, shareholder agreements which referenced "any of his agreements . . . including, but not limited to, his employment, confidentiality and option agreements." Jt. Exh. 37 at ¶ 1. Neither Wilde or Silverman nor their counsel ever checked with personnel officials at SPA or elsewhere to determine what "other agreements" the shareholder agreements were referencing.[9]

Similarly, the merger documents, which both Wilde and Silverman reviewed, contain a provision warranting that SPA's officers had signed confidentiality agreements. Jt. Exh. 9 at 19. That same document contains a separate provision stating that "[s]imultaneously herewith, SPA has entered into employment agreements" with five individuals, including Wilde and Silverman. *Id.* at 28.

Nonetheless, neither Wilde nor Silverman inquired as to the "confidentiality agreements" referenced in the merger documents.[10]

Subsequently, counsel added the "proviso" to paragraph 14. In DiNapoli's view, the purpose of the proviso was "[t]o address the possibility that the old agreements would for a period exist simultaneously with this 1990 agreement. If the provisions were not reconcilable, we provided which one of them would take precedent [sic]." Tr. at 378.[11]

Morvillo and DeMartino had a different view of the proviso. They believed the proviso "eviscerated" the exceptions clause. Morvillo testified that:

> I told [DiNapoli] that we were concerned that there might be some agreement out there that he was unwilling or unable to identify, and I wanted to be sure that three years from now there isn't going to be any question about whether my clients were able to go out and open up their own shop or otherwise compete in any way they wanted to do. And we discussed the language to implement that.

Tr. at 516. Thus, in Morvillo's view, the proviso "wiped out" the exceptions clause. In the end, according to Morvillo,

> We narrowed the solicitation and competition activity that [Wilde and Silverman]

lieved, however, that paragraph 14 retained restrictions in other agreements.

7. Morvillo and DeMartino both testified that they proposed eliminating the exception clause, but that DiNapoli refused, stating that he needed to retain the exception clause as a matter of form. DiNapoli did not recall these conversations.

8. Remarkably, Dewhurst also forgot about the existence of the 1982 Agreement he signed.

9. Defendants' failure to recall or investigate the existence of the 1982 Agreements is inexplicable, in light of the multiple references in key documents to other employment agreements, defendants' astuteness about other agreements, their obvious intelligence, and their clear knowledge of and interest in their value and worth to their employer.

10. Mercer's witnesses testified that many terms were used to describe agreements containing non-solicitation and/or non-competition restrictions. For example, while the 1982 Agreement is captioned "Employment Agreement," the updat-

ed version of the employment agreement which Wilde and Silverman were requested to sign, but did not sign, in 1989, was captioned "Confidentiality Agreement." Jt.Exh. 50. Interestingly, Morvillo testified that one draft version of paragraph 14 of the 1990 Agreement referenced "confidentiality agreements." He objected to the language, advising DiNapoli that his clients had not signed such an agreement. According to Morvillo, DiNapoli seemed surprised, and seemed to think Wilde and Silverman had signed such agreements. Yet neither Morvillo nor his clients inquired further about the existence of prior agreements, even after this exchange.

11. At trial, DiNapoli could not identify a circumstance where the 1982 and 1990 Agreements would conflict such that compliance with both would be impossible. He testified, however, that while he "[did]n't know that we had anything in mind [regarding a situation when the 1990 Agreement would control], . . . [t]he proviso was a fallback. . . . If we had been able to identify a conflict, we would have addressed it on the spot, but it was a drafting nicety, as far as I was concerned." Tr. at 402.

couldn't engage in, and we made it darn clear that that was the end of the restriction forever and ever. As soon as three years was over, they were free.

Tr. at 520. In Morvillo's view, the proviso was the language which made Wilde's and Silverman's freedom to compete after three years "darn clear." Tr. at 521. Thus, according to Morvillo, he was advised by DiNapoli that after the three year period in paragraph six expired, Wilde and Silverman could "do whatever the heck they wanted." Tr. at 515.[12] According to Morvillo, DiNapoli never contradicted the view that Wilde and Silverman would be free to compete in three years; in fact "I thought, and still think, Mr. DiNapoli agreed at the end of three years my clients were free to do anything, notwithstanding what might be said in some other piece of paper in somebody's files somewhere." Tr. at 537.

DiNapoli denied that Morvillo or DeMartino conveyed to him their view that the proviso, in effect, "wiped out" the exception clause. He testified that he would not have agreed to language achieving such a result, because "[i]t would be ridiculous to have a research assistant with six months of experience subject to a nonsolicitation [agreement] while the rainmakers were free." Tr. at 379.

Thus, DiNapoli interpreted the 1990 Agreement as follows:

[T]he noncompetition agreement ran out ... in February of 1993, and the nonsolicitation would run out one year after they terminated employment. And so it's not the longer of either of this or that and combining nonsolicits with noncompetes and messing them all together. They are entirely different agreements, different restrictions, difference in scope, difference in duration, and difference in expiration dates. And they wanted to be able to

compete after three years, and they could ... But as to solicitation, one more year they had to leave alone the client base that we bought and paid for.

Tr. at 411.[13]

## B. Mercer's Policy on Restrictive Covenants

TBS and SPA had different policies on requiring employees to sign confidentiality or non-solicitation agreements, and these differences carried over to Mercer following the merger. As previously discussed, TBS required entry level employees to sign agreements protecting client confidences, but only required non-solicitation agreements of those employees who held stock. SPA, on the other hand, required all of its consultants to sign agreements containing both confidentiality and non-solicitation (or, more precisely, non-interference) provisions. Mercer's "inside board" recognized this disparity in policies, but did not immediately address it due to other pressing concerns. Thus, TBS employees who had not been required to sign a non-solicitation agreement were not required by Mercer to sign such an agreement. Dep. of Scott Davenport at 84.

According to Robert Duboff, Mercer's present policy is for new employees to sign confidentiality agreements, and for partners to sign non-solicitation agreements, with the difference attributable to the high level of client contact by partners but not new employees. Interestingly, Duboff's own non-solicitation agreement restricts solicitation of clients, but not solicitation of employees.

## C. The Marzipan

As part of the SPA acquisition, Mercer established a "marzipan," designed to pay cash bonuses to consultants who remained

---

**12.** DiNapoli testified that in any comments along these lines, he intended to convey that Wilde and Silverman would be free from the *non-competition* restrictions contained in paragraph six after three years; however, restrictions contained in other existing agreements (such as the non-interference provisions in the 1982 Agreements) would survive. He did not articulate this distinction between competition restrictions and other restrictions because he believed the difference was obvious. In DiNapoli's words, "[Morvillo]'s

a lawyer ... It's all there in black and white." Tr. at 412.

**13.** Roy Barbee, former head of Mercer's Washington office, offered a similar interpretation. In his view, the 1990 Agreement was a "bolt-on" to the 1982 Agreement, meaning that the restrictions contained in the 1982 Agreement were added on top of the restrictions contained in the 1990 Agreement. Tr. at 103.

employed after the merger and who met performance goals. "Marzipan" was described at trial as a financial "sweetener" offered to employees who might otherwise have obtained a larger equity interest had the merger not occurred, and it was intended as an enticement for employees to remain with the company for a period of time following the merger. Mercer had utilized a similar arrangement in its acquisition of TBS.

According to Mercer's witnesses, in the TBS transaction, TBS leaders who held substantial stock did not participate in the marzipan, because they already stood to gain substantial financial rewards due to their stock holdings. Rather, the marzipan was designed to benefit valued employees who were not among the firm's top leaders.

Similarly, according to Ray Barbee, a former SPA Policy Committee member and head of Mercer's Washington, D.C. office, employees who were major stockholders at SPA, such as himself, Wilde and Silverman, did not participate in the SPA marzipan. Mercer's witnesses proffered several explanations for this. Thomas Waylett expressed concern that if top officers participated in the marzipan, the transaction might not qualify as a "pooling of interest" transaction, and thus SPA's goodwill would have to be transferred to MMC's balance sheet. Moreover, because of their substantial stock holdings, key stockholders benefitted financially from the merger even though not participating in the marzipan. For example, Wilde and Silverman each stood to gain approximately $2 million from their stock holdings as a result of the merger. Finally, Mercer's witnesses contended that it was unnecessary for them to include SPA's leaders in the marzipan, because they had obtained employment guarantees from those individuals by virtue of the 1990 Agreements.

Wilde and Silverman initially believed they should participate in the marzipan.[14] In part, they believed they should participate because while their stock holdings were significant, they were substantially less than other Policy Committee members. Wilde and Silverman contend that they agreed to withdraw from the marzipan when Walker Lewis, head of SPA, orally promised them that if they withdrew, they would each receive a $300,000 payment in Mercer's "first good year" after the merger. A "good year" was understood to be a return on sales of 10 percent or more. The alleged agreement was never memorialized in writing.

Ray Barbee testified that he was unaware of Wilde's and Silverman's alleged agreement with Walker Lewis, and stated that he "would have hit the roof" had he known of it, because of the disproportionate stock holdings of the Policy Committee members as compared to other employees. Tr. at 124–25. Similarly, Waylett credibly testified that he was not aware of any promise on Walker Lewis' part as alleged by Wilde and Silverman. Moreover, prior to closing the merger deal, SPA was required to disclose all of its material business obligations, and no mention of the agreement between Lewis and Wilde and Silverman appeared in the disclosures. Tr. at 875. Regrettably, Lewis was not called to testify at trial by either plaintiff or defendants.

Mercer experienced "good years" in 1990 and 1992.[15] Wilde and Silverman neither demanded nor were paid the $300,000 they contend they were promised, nor have they been paid this sum at any time since. Indeed, Wilde and Silverman never demanded payment at any time prior to leaving Mercer's employ; rather, their first demand came in the form of their counterclaim in this litigation.

In view of the foregoing facts, and the testimony of all witnesses on this issue, the Court does not find credible Wilde's or Silverman's testimony concerning Lewis' al-

---

**14.** A February 15, 1990, memorandum from Francois deCarbonnel and Walker Lewis indicates that "initially it was expected that all 'Partners' would be eligible to participate", however, "the Policy Committee [of which Wilde and Silverman were members] withdrew themselves from any consideration, in order to ensure that the pool would stretch as far as possible to reward 'Partners' and others." Jt.Exh. 176.

**15.** While Mercer's overall return in 1990 was more than 10 percent, Silverman testified that Mercer's business took a serious turn for the worse at the end of 1990 and throughout 1991.

leged promise of a $300,000 payment following Mercer's first "good year" following the merger. The fact that no mention of the alleged promise was made by either defendant at any time prior to the commencement of this litigation severely undermines their testimony, as does the fact that defendants produced no evidence other than their own self-interested testimony of the existence of the agreement. In their capacities as vice presidents and directors of Mercer, Wilde and Silverman were no doubt well aware that Mercer had a "good year" by at least 1992; yet, neither defendant made a demand for payment of their $300,000 at the start of 1993, at the time they left employment, or indeed, at any time prior to the commencement of this litigation. The Court simply does not find Wilde's or Silverman's testimony credible on this point; accordingly, the Court finds that no oral contract existed relating to these defendants' withdrawal from the marzipan.

### D. *The Creation of Dean & Co.*

Following the SPA/TBS merger, morale suffered at the former SPA offices.[16] A substantial number of former SPA employees became dissatisfied with Mercer and left the company.[17] By late 1992, Wilde and Silverman were the only senior SPA officers still with the merged company. Wilde and Silverman had many conversations between themselves and with Dewhurst and others about their frustrations with Mercer. In addition, they began to consider seriously their career options.

In November or December 1992, Wilde, James Smist (another Mercer employee), Dewhurst, and Silverman met at Smist's home.[18] Among other matters, they discussed the prospect of forming a new company. They reviewed and commented on a pro forma profit and loss statement that Wilde had prepared on a Mercer laptop computer,

and discussed computers and other business needs. Because it was clear that more information was needed, each of them volunteered to further research particular items. For example, Dewhurst volunteered to look at computer systems. They agreed to meet again at an unspecified future date.

In January 1993, Wilde and Silverman made general inquiries about office space. They drove around the McLean, Virginia area and looked at office buildings. That same month, Wilde began discussing with Dewhurst options for a computer system for a new business.

By mid-February, Wilde and Silverman discussed the possibility of terminating their employment with Mercer by the end of March. Wilde and Silverman met with an accountant, Robert Branson, to discuss forming a new company. On February 23, 1993, Wilde and Silverman met with an attorney, Joel Simon, to discuss incorporating. Subsequently, on February 25, 1993, "DNA Associates, Inc.," of which Wilde and Silverman were sole stockholders, was incorporated in Virginia. The company's name was later changed to "Dean & Company Strategy Consultants, Inc.".

In late February or early March, 1993, Wilde, Silverman, Dewhurst and Smist met at Wilde's home. Among other matters, Dewhurst reported on his research on computer systems and Wilde and Silverman discussed various administrative issues. By that time, Smist had researched real estate and other expenses.

In March 1993, Wilde or Silverman met and spoke on several occasions with Greg Sutton, a real estate broker, who assisted Wilde and Silverman in locating potential office space. Silverman provided Sutton with information on the amount of office space required and their anticipated staffing

---

**16.** According to numerous witnesses, the companies had greatly different cultures and practices. The need to integrate the two companies and create a common corporate culture was a topic at a number of meetings of the Policy Committee and inside board.

**17.** For example, by April 1993, 14 of 22 vice presidents had left Mercer's Washington office.

**18.** Dewhurst testified that he was not interested in joining another consulting firm at the time of the December meeting, but that he provided assistance to his friends in their exploration of a new business. He did not decide to join Dean & Co. until after he left Mercer's employment.

levels. That same month, Wilde, Silverman, Dewhurst and Smist met with an insurance agent to discuss employee benefit plans and life insurance.

On March 5, 1993, Dewhurst submitted his letter of resignation to Mercer, effective March 15, 1993.[19] On March 21, 1993, Wilde and Silverman signed and caused to be filed an "S" corporation election form and an application for an employer identification number, both of which stated that Dean & Co. had incorporated on February 25, 1993.

On Friday, April 2, 1993, Wilde and Silverman resigned, effective immediately.[20] At no time did they inform Mercer of their plans to operate a competing consulting business; rather, Wilde told Mercer's president that he was interested in "investments and turnarounds".[21] Silverman's letter of resignation spoke of spending more time with his family. He told Duboff he was taking time off to spend time with his child and to pursue investments. Wilde and Silverman began operations at Dean & Co. the following Monday, April 5, 1993.

Wilde is Chairman of Dean & Co. Silverman is President, and Dewhurst is Chief Financial Officer and Executive Vice President. Wilde and Silverman held all shares in the corporation until July 5, 1995, and currently hold a majority of the shares. Dean & Co. is engaged, among other things, in the management consulting and strategic planning business.

### E. Defendants' Activities at Mercer while Establishing Dean & Co.

During the time defendants were making their arrangements to leave Mercer's employ, they were compensated handsomely.[22] Moreover, all defendants received large bonuses in late December 1992 and February 1993. Bonuses were typically paid in February for the prior year's performance, but the 1992 bonuses were paid in two installments to enable employees to take advantage of certain changes in tax laws.

Mercer's chairman, Thomas Waylett, testified that if he had known of the defendants' plans to leave Mercer and open a competing business, he would have fired them immediately and not paid them their bonuses. Significantly, Mercer did not take any of these actions with respect to James Smist once Mercer learned of the potentiality of Smist leaving to join Dean & Co.—rather, they offered to make Smist the head of the Washington, D.C. office.

In the months prior to their departure from Mercer, Wilde and Silverman were highly involved in Mercer's affairs in their roles as members of the Policy Committee, the Board of Directors, and the inside board. The inside board met on November 19, 1992; the Board of Directors and inside board met on December 7, 1992; and both boards also met in February 1993. Unquestionably, through their positions on the boards, Wilde and Silverman had access to information of the most confidential and sensitive sort regarding Mercer's clients, revenues, targets, and other matters.

Prior to their departure from Mercer, all three defendants participated in meetings and other work for Mercer clients whom Dean & Co. subsequently solicited. For example, on February 16, 1993, Wilde and Silverman traveled at Mercer's expense to meet

---

**19.** Dewhurst did not disclose in his letter of resignation that he would be joining Dean & Co. He testified that he did not know at that time whether he would join the new company. Instead, Dewhurst's letter of resignation speaks of "try[ing] my hand at writing" and other pursuits. Jt.Exh. 66.

**20.** While neither Wilde nor Silverman formally gave advance notice of their departures, both Wilde and Silverman had discussed their dissatisfaction and exploration of career options with Paul Fulchino, who was then President of Mercer, in the days and weeks leading up to their departure from Mercer. In fact, Silverman testified that he told Fulchino he was seriously thinking of leaving Mercer and starting his own business. Fulchino's deposition testimony was consistent with Wilde's and Silverman's testimony at trial. Fulchino Dep. at 125–129.

**21.** Among other statements, Wilde's letter of resignation stated that "Before I get too old I want to try my hand in a more entrepreneurial and investment oriented venture." Jt.Exh. 68.

**22.** Wilde was paid $18,750 twice per month; Silverman received $18,333.34 twice per month, and Dewhurst received $9,166.67 twice per month.

with John Wilson of Bell Canada. While Silverman had a prior relationship with Wilson, Wilde had not previously met Wilson. According to Silverman, Wilson requested the meeting and asked that Silverman bring with him the head of Mercer's telecommunications group as well as someone experienced in international communications. Believing that Wilde fit the bill, Silverman brought Wilde to the meeting. Wilde and Silverman testified that the meeting was conducted for the sole purpose of soliciting business for *Mercer*, not Dean & Co. According to these witnesses, they had not decided to leave Mercer at the time of the meeting. Mercer asserts, in contrast, that Wilde and Silverman were soliciting for Dean & Co. at the meeting, contending that the meeting was designed to solidify Silverman's and Wilde's relationship with Wilson in the hopes of obtaining business for Dean & Co. No work for Mercer resulted from the meeting.

On March 31 and April 2, 1993, Dewhurst and Wilde attended meetings at AT & T on Mercer's behalf. After the March 31 meeting, Dewhurst visited an AT & T representative and told him he would be joining a new consulting business. Similarly, on April 1, 1993, while still employed by Mercer, Silverman told Kirk Baudin, a representative of Sara Lee Knit Products, that he was resigning and starting his own consulting company. Baudin invited Silverman to a meeting on April 5, 1995, which Silverman attended.[23]

When his departure from Mercer was imminent, Wilde sent two tape diskettes to Mike Pfau of AT & T–DCS, which were compilations of all prior work Wilde had done for AT & T–DCS and related work for other units of AT & T.[24] Wilde testified that he had the diskettes prepared because he often was unable to locate prior work done for AT & T–DCS when requested by the client. He testified that he has not requested or had

access to the information on the diskettes since he left Mercer's employment, and Mercer did not present contradictory testimony on this point.

Silverman had a similar diskette of information sent to Jim DeRose, President of Sara Lee Knit Products. The tape included work for Knit Products as well as other Sara Lee divisions. Silverman testified that he asked for the tape to be prepared in January, but that on his last day of employment, his administrative assistant reminded him that the tape had not been sent, and he asked her to send it at that time. Silverman presented unrebutted testimony that he has not requested or had access to the information on the diskette since he left Mercer's employment.

According to Mercer's witnesses, never before had such compilations been sent to a client, particularly compilations containing work performed for other divisions of a company. Robert Duboff testified that sending the tapes would benefit Dean & Co. because it would reassure former Mercer clients that they would experience no disruption in service if they switched their business to Dean & Co.

Finally, and significantly, at no time prior to their departure from Mercer did Wilde, Silverman, or Dewhurst perform services for a client under the auspices of Dean & Co. Ray Barbee testified that he noticed no decline in Wilde, Silverman, or Dewhurst's work performance prior to their departure, nor did any clients advise him of being solicited by Wilde, Dewhurst, or Silverman for a competing business prior to their departure.[25]

### F. *Alleged Solicitation of Mercer Employees*

Mercer urges the Court to find that Wilde and Silverman solicited various Mercer em-

---

**23.** Waylett testified that performing services for clients until the day of departure constituted solicitation because it "inured" the consultant to the client. This view, while novel, is not persuasive.

**24.** The exact date on which the tapes were sent is unclear from the record; however, it is clear to the Court that the tapes were mailed in very close proximity to the time of Wilde's departure.

**25.** Robert Duboff implied that Wilde's and Silverman's performances slipped prior to their departure, as evidenced by lower "Shared Revenue Credits" in the quarter following their departure. Duboff's general testimony on this point does not outweigh other testimony at trial that all defendants fully performed their jobs prior to their departure.

ployees both prior and subsequent to their departure from Mercer. Mercer contends that Wilde and Silverman solicited Smist and Dewhurst to work for Dean & Co., beginning at the meeting in November or December 1992. However, the Court finds credible Smist and Dewhurst's testimony that they viewed their discussions with Wilde and Silverman regarding a possible business venture as conversations among long-time friends, and not as solicitation. The fact that Wilde and Silverman held more prominent positions at Mercer does not necessarily mean, as Mercer contends, that Wilde and Silverman took advantage of a power relationship to woo their colleagues to Dean & Co. Rather, the Court is persuaded that the discussions reflected a collegial and mutual exploration of a possible business venture in which some or all of them might participate.

In the week prior to their resignations on April 2, 1993, Wilde and Silverman scheduled a dinner with three Mercer employees, to be held the evening of April 2, 1993 at the Ritz Carlton. Wilde and Silverman openly admitted that they intended at the dinner to solicit the employees for employment at Dean & Co. In advance of the dinner, Wilde had Dewhurst prepare several charts outlining the structure and philosophy of Dean & Co. Also in advance of the dinner, Silverman obtained the employment agreement of one of the employees, Jamie Bonomo, and showed it to his lawyer. At the dinner, Wilde and Silverman did in fact explore the Mercer employees' interest in joining Dean & Co.

On April 6, 1993, three Mercer employees, Dewhurst, and Silverman, went to Wilde's house to discuss Dean & Co. In addition, Wilde and Smist met at Wilde's house on April 7, 1993, to discuss the April 2, 1993 dinner and to discuss whether Smist would join Dean & Co.

Dewhurst began employment with Dean & Co. in early April, 1993. Subsequently, Dean & Co. hired Gregory Lowell, who began work for Dean & Co. on October 25, 1993. Dean & Co. also hired Ware Adams, who began work

at Dean & Co. on November 1, 1993. Smist joined Dean & Co. on April 5, 1994. Lowell, Adams, Dewhurst, and Smist were all parties to employment agreements with Mercer.

### G. *Competitive Activities by Dean & Co.*

In the course of their discussions about the formation of Dean & Co, Wilde, Silverman and Dewhurst discussed who Dean & Co's potential clients would be. Among other companies, AT & T and Sara Lee were discussed. All three continued to work on matters for these clients until the day they left Mercer's employ. Following their resignations, Wilde and Silverman solicited and performed work for a number of Mercer clients, as did others at Dean & Co.[26]

On April 5 or 6, 1993, Wilde telephoned Michael Pfau of AT & T–DCS and informed him that he had left and started a new consulting company. On April 7 and April 20, 1993, Wilde and Dewhurst met with Pfau and James Cannon of AT & T–DCS, on behalf of Dean & Co. They prepared an outline for a project and attempted to sell consulting services to AT & T–DCS. The proposal was rejected; therefore, no work for Dean & Co. was generated as a result of the April 7 and April 20 meetings. Wilde himself generated a subsequent proposal that DCS accepted. Dewhurst performed no subsequent work for AT & T.

Through April 2, 1994, Dean & Co. performed work on various projects for three units of AT & T: AT & T–DCS, AT & T TransTech, and AT & T FTS–2000. Mercer had previously performed work for AT & T–DCS and TransTech, and Wilde and Dewhurst were involved in some of that work on Mercer's behalf. Mercer concedes that it had not performed work for AT & T's FTS–2000 unit. However, the Director of that unit, Richard Roca, was someone with whom Wilde and Dewhurst had become acquainted in the course of their work at Mercer.

Dean & Co. received revenues from various units of AT & T of $1,664,597 for services rendered through April 2, 1994. Of this

---

**26.** The parties dispute the definition of "client," with Mercer contending that "client" refers to the entire company and defendants contending

that "client" refers only to the unit for whom a particular project was performed.

amount, $549,402 was in connection with work for DCS, $984,195 was for work for FTS–2000 and $131,000 was for work for TransTech. Dean & Co. received an additional $909,453 from various AT & T units for work performed after April 2, 1994 on projects commenced or solicited before that date, including $198,098 for work for DCS and $711,355 for FTS–2000.

Another Mercer client solicited by Dean & Co. was Sara Lee. On April 5, 1993, Silverman visited representatives of Sara Lee and subsequently solicited Sara Lee for work. Among other suggestions, Silverman proposed that Dean & Co. update work performed for Sara Lee by Mercer, utilizing Dean & Co.'s knowledge of Sara Lee. Dean & Co. received $2,500 for work performed for Sara Lee.

Defendants argue that Mercer failed to prove damages—that Mercer failed to show that it would have received the work and revenues had Dean & Co. not performed the work. This assertion is not persuasive in view of the close (and lucrative) relationship between Mercer and its key clients, including AT & T and Sara Lee, and the importance of its key professionals, such as Wilde and Silverman, in those relationships. Had Wilde and Silverman not sought to capitalize on their personal relationships with Mercer's clients to obtain the business for their newly established company, it is highly likely that Mercer would have obtained the business, given its longstanding relationship with these companies.

## II.  *CONCLUSIONS OF LAW*

### A.  *Breach of Fiduciary Duty and "Well and Faithfully" Clause of 1990 Agreement*

The Court previously denied defendants' motion for summary judgment on Mercer's claims relating to breach of fiduciary duty, stating that "resolution of the question of whether defendants' actions constituted a breach of fiduciary duty ... requires 'a thoroughgoing examination of the facts and circumstances' presented in this case." Mem. Op. and Order (June 28, 1995) at 6–7. Having heard and evaluated the testimony elicit-

ed at trial, the Court has concluded that defendants' actions, while perhaps questionable on moral or ethical grounds, do not rise to the level of a breach of fiduciary duty. The claims of breach of the "well and faithfully" clause in the 1990 Agreements, the facts and analysis of which parallel the fiduciary duty claim, similarly fail.

■ Corporate officers and directors owe "an undivided and unselfish loyalty to the corporation" such that "there shall be no conflict between duty and self-interest." *Guth v. Loft,* 23 Del.Ch. 255, 5 A.2d 503, 510 (1939); *see also* Restatement (Second) of Agency § 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.") Similarly, "an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." Restatement (Second) of Agency § 393.

■ At the same time, however, the law is clear that "an agent can make arrangements or plans to go into competition with his principal before terminating his agency, provided no unfair acts are committed or injury done his principal." *Science Accessories Corp. v. Summagraphics Corp.,* 425 A.2d 957, 962 (Del.1980). Thus,

> [e]ven before the termination of the agency, [an employee] is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete.

Restatement (Second) of Agency § 393 comment e.

■ Still, as the Court stated in *Science Accessories,* "[t]he right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty." 425 A.2d at 965 (quoting *Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d 564, 569–70 (1978)). The limitations of an

officer's preparatory activities have been described as follows:

> Prior to termination of employment, an officer may not solicit for himself or herself business which the position requires the employee to obtain for the employer. The officer must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert his or her best efforts on behalf of the employer.

William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 856 (perm. ed. rev. vol. 1994). In preparing to compete, an employee may not commit fraudulent, unfair, or wrongful acts, such as misuse of confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees. *Science Accessories*, 425 A.2d at 965. At the same time, failure to disclose plans to enter into competition is not itself necessarily a breach of fiduciary duty. *Science Accessories*, 425 A.2d at 965; Fletcher Cyclopedia Corporations § 856. Thus, "the ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts and circumstances of the particular case." *Maryland Metals*, 382 A.2d at 570; *Science Accessories*, 425 A.2d at 965 (quoting same); Fletcher Cyclopedia Corporations § 856 (same).

■ The evidence at trial established that while still employed by Mercer, Wilde and Silverman in particular, and to a lesser extent Dewhurst, took numerous actions to establish what was to become Dean & Co., a competing business. Not only did they incorporate Dean & Co., but they made arrangements for office space, inquired about benefit packages, investigated computer systems, and met with an accountant.

It is evident to the Court that by at least late February 1993, Wilde and Silverman were intent upon forming their own company. The precise contours of the business might not have been fully developed, but Wilde and Silverman were plainly moving quickly down the road toward starting their own competing consulting business. Indeed, Dean & Co. was incorporated on February 25, 1993.

At no time prior to their departure did Wilde, Silverman, or Dewhurst disclose their actions or intentions to their colleagues at Mercer. They continued to perform work for Mercer, including meetings with clients they would later solicit on behalf of Dean & Co. Wilde and Silverman continued to attend meetings of the Board of Directors and inside board, at which information of the most confidential sort was discussed.

At the same time, the record is clear that at no time prior to their departure from Mercer did Wilde, Silverman, or Dewhurst solicit Mercer's clients on behalf of what was to become Dean & Co., or perform any competing consulting work under the auspices of Dean & Co. Mercer urges the Court to find that defendants breached their fiduciary duty by performing work for Mercer until their departures, because, in Mercer's view, these efforts were plainly aimed at solidifying relationships to inure to the benefit of Dean & Co. While the Court does not doubt the sincerity of plaintiff's view, the Court is not persuaded that an employee breaches his fiduciary duty by performing work for his employer at a time when he is planning to leave his employment. The Court recognizes that personal relationships with clients are paramount in the management consulting business, and that defendants' contacts with Mercer's clients, if positive, could potentially work to the benefit of defendants' competing business. However, the Court finds unreasonable and unrealistic the proposition that any client contact prior to leaving one's employment and starting a competing business constitutes a breach of one's fiduciary duty. In the absence of evidence that any overt solicitation was made or other improper actions taken in the course of defendants' client contacts, the Court does not find the Bell Canada meeting or other client contacts to constitute a breach of fiduciary duty.

In the final analysis, upon full consideration and evaluation of all of the facts and circumstances presented in this case, the Court has determined that while defendants' covert actions in establishing Dean & Co. were not particularly admirable, they did not

constitute a breach of their legal fiduciary duties of loyalty to Mercer. As previously noted, *supra* at 24, the Court finds that Wilde and Silverman did not solicit Dewhurst to leave Mercer and join Dean & Co. Moreover, while the record is clear that Wilde and Silverman extended invitations to a dinner to solicit Mercer employees while they were still employed by Mercer, it is equally clear that the dinner did not take place until after the conclusion of Wilde's and Silverman's last day of employment at Mercer, albeit later that same day. Moreover, it appears that none of the individuals solicited by Wilde and Silverman at the dinner ultimately joined Dean & Co. Consequently, Mercer's damages resulting from the dinner are not evident.

Similarly, during the time they were establishing Dean & Co. and preparing to compete, all three defendants continued to perform fully their duties for Mercer.[27] Indeed, Mercer's Chairman testified at trial that time was not the issue with respect to defendants' alleged disloyalty; rather, the issue was defendants' preparations to compete with Mercer while still on Mercer's payroll.

Apart from the stealth with which defendants established their competing business, the most troublesome aspect of Wilde's and Silverman's actions concerned their compilation and mailing to two major clients (AT & T and Sara Lee) tape diskettes containing the history of Mercer's work for those clients. The timing and unprecedented nature of these actions leaves no doubt that Wilde and Silverman intended for the diskettes to increase AT & T and Sara Lee's comfort level with switching their business from Mercer to Dean & Co. Arguably this action constituted misuse of confidential information in violation of Wilde's and Silverman's fiduciary duties. However, in view of the uncontroverted testimony of Wilde and Silverman that they have not had access to the information on the tape at any time, and the utter lack of testimony from relevant officials at AT & T or Sara Lee concerning the effect, if any, of the tapes on their decision to switch their business to Dean & Co., the Court finds that the compilation and mailing of the tapes, while certainly inappropriate, did not rise to the level of a breach of defendants' fiduciary duty.

For the foregoing reasons, judgment shall be entered for Wilde, Silverman, and Dewhurst on Mercer's claims relating to breach of fiduciary duty. Because Mercer's allegations concerning breach of the "well and faithfully" clause of the 1990 Agreements are based on the same facts and circumstances as the fiduciary duty claim, judgment shall similarly be entered in defendants' favor on this breach of contract claim.

### B. *Breach of 1982 Agreement*

A threshold question to be resolved in connection with Mercer's breach of contract claims relating to Wilde's and Silverman's 1982 Agreements concerns whether the Agreements survived the 1990 Agreement. As previously discussed, paragraph 14 of the 1990 Agreements states that the 1990 Agreement contains the full agreement of the parties, *except* for non-compete or non-solicit agreements or agreements relating to confidential information, which shall remain in full force and effect, *unless* a conflict existed between those provisions and the 1990 Agreement, in which case the 1990 Agreement controls.

"The basic rule of contract construction gives priority to the intentions of the parties." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985). In ascertaining the meaning and intent of contract language, the starting point is obviously the language itself. *Citadel Holding Corp. v. Roven*, 603 A.2d 818 (Del. 1992). A contract is construed as a whole, giving effect to all of the contract's provisions and avoiding a construction which would render one of those provisions meaningless. *Leeds v. First Allied Connecticut Corp.*, 521

---

**27.** While there was some testimony that Wilde's and Silverman's Shared Revenue Credits were lower for the quarter following their departure, suggesting that their efforts might have slacked off in their final months of employment, the evidence on this point was far from clear and fails to outweigh the evidence supporting Wilde's and Silverman's position that they fully performed their jobs.

A.2d 1095, 1097 (Del.Ch.1986); *Seabreak Homeowners Ass'n, Inc. v. Gressler*, 517 A.2d 263, 269 (Del.Ch.1986), *aff'd*, 538 A.2d 1113 (Del.1988). While extrinsic evidence may be considered when a contract is subject to a number of different interpretations, the greatest weight should be given to the express language of the contract itself. *Coca–Cola Bottling Co. v. Coca–Cola Co.*, 769 F.Supp. 671, 706 (D.Del.1991), *aff'd*, 988 F.2d 414 (3d Cir.1993). Finally, in determining intent, the overt acts and statements of the parties are examined through the eyes of an objective observer. *Leeds*, 521 A.2d at 1097.

Because the Court previously determined that the language in paragraph 14 was subject to a number of different interpretations, the Court allowed extrinsic evidence on paragraph 14's meaning and intent. That evidence failed to elucidate a definitive explanation of the parties' expressed intentions at the time of contract formation. Thus, the Court must ascertain the reasonable meaning and effect of paragraph 14 primarily from the language itself, with the extrinsic evidence of the parties' negotiations as a backdrop.

■■■ Upon careful evaluation of the language of the contract and the evidence presented at trial, the Court is persuaded that paragraph 14's proviso clause did not eviscerate the exceptions clause. Moreover, the Court is persuaded that no conflict existed between the 1982 Agreement and the 1990 Agreement. Accordingly, the restrictions contained in the 1982 Agreements survived the 1990 Agreement.

On its face, the proviso does not eviscerate the exceptions clause; rather, it provides that the 1990 Agreement takes precedence if the 1990 Agreement conflicts with a prior agreement. The Court is not persuaded by the testimony of Morvillo and DeMartino that all parties to the negotiations mutually intended for the proviso to obliterate the exceptions clause.[28] Rather, the Court finds persuasive DiNapoli's testimony concerning his communicated intention to protect "whatever was out there," and his interpretation of the proviso as addressing a contingency (*i.e.,* conflict) that may or may not come to pass. Significantly, this testimony comports fully with the express language of the agreement. In addition, the Court credits DiNapoli's testimony that he would have rejected contract language obliterating the exceptions clause, testimony which is bolstered by Morvillo's and DeMartino's recollection that DiNapoli refused to eliminate the exceptions clause. Finally, the Court observes that the interpretation urged by Morvillo and DeMartino would render the exceptions clause meaningless, a result which canons of contract construction seek to avoid. Thus, the Court finds that the proviso, like its words indicate, addressed the potentiality of conflict between the 1990 Agreement and earlier agreements relating to competition, solicitation, or confidential information, and provided that in the case of conflict, the 1990 Agreement would control.

No inherent conflict existed between the two contracts. Each provided Mercer a certain type of protection against competition and solicitation of its clients and employees. The 1990 Agreement assured Mercer that Wilde and Silverman would not compete with Mercer or solicit its clients or employees. However, those protections expired three years from the date of the merger. The 1982 Agreement provided Mercer protection against interference with its clients and employees for one year from the termination of Wilde's and Silverman's employment, whenever that termination occurred. If the termination happened to occur within two years of the merger, then the 1982 Agreement's restrictions would yield to the 1990 Agreement's restrictions, due to the stricter restrictions contained in the 1990 Agreement. In any other instance, the 1982 Agreement's one-year restriction would be triggered.

In any case, because the 1990 Agreement expired in February 1993, no conflict existed between its provisions and the restrictions contained in the 1982 Agreements. Even though the 1990 Agreement was no longer in effect at the time Wilde and Silverman left

---

**28.** Such a construction would be so wholly at odds with the express language of paragraph 14 that strong evidence of mutually expressed intent would be required to reach such a result.

Mercer's employ, the 1982 Agreement was still viable.

■ Defendants contend that the 1982 Agreements are void as violative of the public policy against restrictive covenants. In order to be valid, covenants not to compete must protect some legitimate interest of the employer and must be reasonable in their scope. *Ellis v. Hurson Assoc., Inc.,* 565 A.2d 615, 618 (D.C.1989). Restrictions are unreasonable if "the restraint is greater than is needed to protect the promisee's legitimate interest, or ... the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." *Id.* Significantly, a "restraint is easier to justify ... if the restraint is limited to the taking of his former employer's customers as contrasted with competition in general." *Id.*

■ Here, the Court finds that Mercer has demonstrated a legitimate purpose in requiring its employees to sign the 1982 Agreement—namely that Mercer wished to protect the investment it made in its employees, preserve the confidentiality of information gleaned in the course of employment at Mercer, and protect itself from its employees leaving and capitalizing on Mercer's client base. The Court finds unpersuasive defendants' argument that because Mercer's post-merger policy concerning restrictive covenants was inconsistent, Mercer necessarily cannot demonstrate a legitimate interest in the agreements. In the years prior to the merger, SPA required all consultants to sign such agreements. TBS required similar agreements of its senior employees. Mercer presently requires all senior officials to sign such agreements. The fact that for a period of time following the merger not all employees of the former TBS were required to sign such agreements does not eradicate Mercer's legitimate interests, particularly in view of the disarray and multitude of issues facing the merged company immediately following the merger.

Significantly, the 1982 Agreements do not broadly prohibit competition with Mercer generally, but rather are limited to restricting the rendering of services to Mercer's clients or hiring Mercer's employees. The restrictions are limited to a one-year period of time. In view of the substantial investment Mercer made in its employees, the vital importance of its client base to its business, and the close contacts established between its consultants and its client base, the Court finds that the modest restrictions contained in the 1982 Agreements are reasonable and enforceable.

■ The evidence at trial failed to establish that Dewhurst breached the 1982 Agreement. Dewhurst attended two meetings with AT & T–DCS immediately after joining Dean & Co., and he assisted in the preparation of a proposal for AT & T–DCS, but both Dewhurst and Wilde presented uncontroverted testimony that the proposal was rejected and Dean & Co. obtained no work and no pay as a result of the proposal.[29] Thus, the Court finds that Dewhurst did not "render competitive services" to a Mercer client within one year of the termination of his employment.

Similarly, while Dewhurst was knowledgeable of Wilde's and Silverman's plans to solicit and hire Mercer employees, there is no evidence that Dewhurst assisted in hiring either Adams or Lowell, who are the only Mercer employees identified by Mercer as being hired by Dean & Co. within one year of defendants' departure. Accordingly, judgment in Dewhurst's favor on the breach of contract claim is appropriate.[30]

■ The situation differs with respect to Wilde and Silverman. The evidence at trial established that Wilde and Silverman both "render[ed] competitive services" and hired Mercer employees, namely Lowell and Adams, within one year of their termination of employment with Mercer. These actions constituted material breaches of the 1982

29. Wilde prepared a subsequent proposal for which Dean & Co. did obtain work, but Dewhurst had no involvement in the preparation of the proposal or the resulting work.

30. Because the Court has found no breach of the 1982 Agreement by Dewhurst, judgment shall be entered in Wilde's and Silverman's favor on Mercer's tortious inducement claims relating to Dewhurst's alleged breach (Count VI of the Amended Complaint).

Agreements for which Wilde and Silverman are liable.

■■■ The damages recoverable in a breach of contract action include those damages which "arise directly from the breach itself, or could reasonably have been in contemplation of both parties when they made the contract." *Howard Univ. v. Baten,* 632 A.2d 389, 392 (D.C.1993). It is axiomatic that while a plaintiff need not prove damages with mathematical certainty, a plaintiff must provide a reasonable basis upon which damages may be estimated. *Garcia v. Llerena,* 599 A.2d 1138, 1142 (D.C.1991); *see also* Restatement (Second) of Contracts § 352, comment a (1981); Williston on Contracts (3d Ed.1968) § 1345. A number of different methods are permissible for estimating lost profits, including evidence of past performance by an established business, or profits made by others. *See* Restatement (Second) of Contracts § 352, comment b; Williston on Contracts §§ 1345, 1346A.

As previously noted, the 1982 Agreement does not expressly prohibit solicitation of SPA's (now Mercer's) clients, but states that the consultant shall not "render competitive services ... to any person or firm" to which SPA (now Mercer) had rendered services or solicited business. The agreement is clear that the prohibition on rendering services applies to the "firm," not a "client" or "division" or "department" within the firm.[31] This language is understandable in light of the intense efforts consulting companies make to develop business relationships with their clients, and is reasonable in light of the one-year limit on the restrictions. Thus, Wilde and Silverman breached their agreements by rendering services not only to AT & T–DCS, but also to AT & T–FTS2000 and AT & T TransTech.

At the same time, the 1982 Agreement is clear that only "render[ing] competitive services," and not mere solicitation, is prohibited. Mercer argues that it should be permitted to recover damages for work performed by Wilde and Silverman in the year *following*

the expiration of the 1982 Agreement, insofar as the work was solicited or begun prior to the expiration of the agreement. In detailing Dean & Co.'s revenues, Mercer did not differentiate between work *begun* prior to the expiration of the 1982 Agreement and work *solicited* but not begun prior to that time. Because the 1982 Agreement does not prohibit solicitation, Wilde and Silverman cannot be held liable for those activities. And because Mercer did not isolate those revenues resulting from work begun prior to the expiration of the 1982 Agreements, the Court has no reasonable basis upon which to award damages for that work.

■■■ With respect to "services rendered" in the year following Wilde's and Silverman's departure from Mercer, the Court has determined that the appropriate measure of damages is the profits Mercer would have received had the work been performed by Mercer instead of Dean & Co. It is evident that Wilde and Silverman would not have been in the position to solicit and perform the work for AT & T and Sara Lee had they not developed close ties and vast experience with these companies during their tenure at Mercer. Moreover, in estimating damages in the context of the management consulting business, the Court must be mindful of the paramount importance of a firm's client-consultant relationships. It is reasonable to presume, given Mercer's close relationship and long experience with those companies, that Mercer would have been in a position to acquire and perform the work had Wilde and Silverman not left Mercer's employ and solicited the work on behalf of their new company.

According to the unrebutted testimony of Mercer's witnesses, Mercer's return on revenues from communications consulting was 20 percent in 1993, and 13.5 percent in other practice areas. Thus, Mercer is entitled to 20 percent of the $1,664,597 in revenues received by Dean & Co. for its work for AT & T prior to April 2, 1994, or $332,919.40. Mercer is also entitled to 13.5 percent of the

---

**31.** Interestingly, other agreements (*e.g.,* Duboff's agreement and the unsigned 1989 agreements) use the term "client" in their restrictions on solicitation. No testimony was given on the reasons behind using the term "firm," but plainly "firm" is a potentially broader term than "client."

$2,500 Dean & Co. received from Sara Lee, or $337.50, for total damages of $333,256.90.

In addition, Wilde and Silverman breached the 1982 Agreements by hiring Ware Adams and Gregory Lowell within one year of Wilde's and Silverman's departures from Mercer. According to Michael Muldowney, Mercer's replacement cost for hiring a new consultant is $22,338 per consultant, and Mercer shall be awarded these costs as damages.[32] In the absence of testimony demonstrating that work did not get performed due to Adams' and Lowell's departures, Mercer shall not be allowed to recover lost profits.[33]

## C. Mercer's Tort Claims

Counts VIII and IX allege that Wilde, Silverman, Dewhurst, and Dean & Co. interfered with Mercer's client and business relationships by soliciting business from Mercer clients.[34] To sustain a claim of intentional interference with business relationships, Mercer must establish 1) the existence of a business relationship; 2) defendants' knowledge of the business relationship; 3) intentional interference with the relationship by defendants; and 4) resulting damages. *Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986). Moreover, the defendants' interference must be improper. "Competitive activity does not by itself constitute intentional interference with prospective business advantage" unless accomplished by wrongful or improper means, such as fraud, violence, or civil suits. *International City Mgt. Ass'n Ret. Corp. v. Watkins*, 726 F.Supp. 1, 6 (D.D.C.1989); Restatement (Second) of Torts § 768 (same).

Essentially, the facts underlying this claim are the same as Mercer's claims relating to defendants' breaches of their 1982 Agreements. The Court has determined that Dewhurst did not render competitive services to Mercer's clients; accordingly, Dewhurst's actions do not constitute intentional interference with Mercer's business relationships. Even if they did, Mercer has shown no damages stemming from Dewhurst's activities.

With respect to defendants Wilde and Silverman, unquestionably their actions in soliciting and rendering services to former Mercer clients interfered with Mercer's business relationships with these clients. Moreover, their actions were improper in the sense of being violative of the 1982 Agreements. However, during the time of their interference with Mercer's clients, Wilde and Silverman apparently did not believe they were under any restrictions against competitive activities. As such, the Court cannot find that they acted with the level of wrongful intent to constitute tortious interference. Nor has Mercer demonstrated that defendants wrongfully utilized confidential information in soliciting the work at issue. Accordingly, judgment shall be entered for defendants on this count. For the same reasons, judgment shall be entered for defendant Dean & Co. on the intentional interference count against it.

Finally, Count X alleges civil conspiracy on the part of Wilde, Silverman, Dewhurst, and Dean & Co., to breach their fiduciary duties, breach their contracts, and

32. Defendants argue that Mercer failed to present its marginal costs of replacing Adams and Lowell, which they contend is the relevant measure of damages. The Court finds that Mercer adequately proved its damages on replacement costs, through the testimony of Duboff and Michael Muldowney. Muldowney presented the average cost of recruiting and training a new consultant, calculated by dividing the number of new hires into total recruitment and training costs. He testified that some costs of replacing senior consultants like Lowell and Adams, such as headhunter fees, would be higher than average.

33. Duboff testified that he could not identify specific projects Mercer failed to solicit or perform due to Lowell and Adams departures. Muldowney testified that Mercer declined to bid on some work due to capacity constraints, but he failed to identify the projects with sufficient precision to justify the requested damages.

34. The counts also involve alleged violations of inducing Dewhurst to violate his 1982 Agreement and inducing Lowell and Adams to breach their employment agreements with Mercer. However, the Court has determined that Dewhurst did not breach his 1982 Agreement. Similarly, Mercer has not demonstrated a breach of the 1982 Agreement on the part of Adams or Lowell. Accordingly, Mercer's tort claims based on those allegations must fail.

commit the other alleged torts. There is no separate tort of conspiracy under District of Columbia law; rather, liability for conspiracy is based on "performance of some underlying tortious act." *Halberstam v. Welch,* 705 F.2d 472, 479 (D.C.Cir.1983); *Griva v. Davison,* 637 A.2d 830, 848 (D.C.1994). Because the Court has determined that no tortious acts were committed by defendants, the conspiracy claim must also fail.

### D. *Wilde's and Silverman's Counterclaim*

Because the Court has found that the evidence failed to establish the existence of an oral promise to pay Wilde and Silverman $300,000 after Mercer's first "good year" following the merger, Wilde's and Silverman's breach of contract claim premised on that alleged oral promise necessarily fails. Judgment shall be entered in Mercer's favor on the counterclaim.

### III. *CONCLUSION*

For the foregoing reasons, it is hereby

ORDERED that judgment shall be entered in favor of defendant Moray P. Dewhurst and against Mercer on counts III, V, VIII and X; it is

FURTHER ORDERED that judgment shall be entered in favor of defendants Dean Wilde and Dean Silverman and against Mercer on counts II, IV, VI, VIII, and X; it is

FURTHER ORDERED that judgment shall be entered in favor of defendant Dean & Co. and against Mercer on count IX; it is

FURTHER ORDERED that judgment shall be entered in favor of Mercer and against defendants Wilde and Silverman in the sum of $377,932.90 on count I;[35] and it is

FURTHER ORDERED that judgment shall be entered in favor of Mercer and against Wilde and Silverman on the counterclaim.

IT IS SO ORDERED.

---

**35.** Because all work constituting the breach occurred under the auspices of Dean & Co., of which Wilde and Silverman were the sole shareholders during the relevant time period, and because the amount of revenues attributable to each defendant's work was not presented with precision, the Court has deemed it appropriate to divide the damages equally and assess one half of the total damages against Wilde and one half against Silverman.